**CHROMALLOY AMERICAN CORPORATION, Plaintiff,**

v.

**ALLOY SURFACES CO., Inc., a Delaware corporation, and George H. Cook, Defendants.**

**Civ. A. No. 3640.**

United States District Court,
D. Delaware.

March 14, 1972.

William O. La Motte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Robert D. Spille and Garo A. Partoyan, of Curtis, Morris & Safford, New York City, of counsel, for plaintiff.

Nathan Bakalar, of Connolly, Bove & Lodge, Wilmington, Del., Irving Parker and Harvey M. Brownrout, of Jacobs, Persinger & Parker, New York City, of counsel, for defendants.

## OPINION

LATCHUM, District Judge.

In this patent suit, the plaintiff, Chromalloy American Corporation, seeks injunctive relief and an accounting for damages against the defendants, Alloy Surfaces Co., Inc. and George H. Cook, for alleged infringement of United States Patent No. 3,257,230 ("the '230 patent") entitled "Diffusion Coating for Metals" issued June 21, 1966 to Richard P. Seelig ("Seelig") and Richard L. Wachtell ("Wachtell") and assigned to the plaintiff. The defendants have counterclaimed for a judgment declaring the '230 patent invalid and unenforceable, and further that the defendants have not infringed that patent.[1]

Without dispute, jurisdiction exists by virtue of 28 U.S.C. § 1338(a) and venue is properly laid under 28 U.S.C. § 1400 (b).

Following extensive discovery proceedings, the defendants filed a motion for summary judgment in which they asserted four separate and independent grounds for declaring the '230 patent invalid or unenforceable. This motion was denied in an unreported opinion. Thereafter the Court, with the plaintiff's consent, granted the defendants' motion, pursuant to Rule 42(b), F.R.Civ.P., for a separate trial of the same four issues raised by the earlier summary judgment motion.

The four issues tried separately by the Court without a jury were:

1. Whether the plaintiff placed the subject matter of the patent in suit "on sale" or "in public use" in this country more than one year before it applied for the patent;

2. Whether, in applying for the patent, the alleged co-inventors made false

---

1. DX 9. References to plaintiff's and defendants' exhibits are cited herein as "PX" and "DX" respectively, to the trial transcript as "Tr.", to the transcript of depositions by using the first and last letters of a witness' surname, e. g. "Sg." for Richard P. Seelig, "Wl." for Richard L. Wachtell, "Sd." for Edward T. Seaward.

oaths as to material facts and thus misled the Patent Office into issuing an invalid patent;

3. Whether the claims of the patent are unlawfully broad in that they include the subject matter of a prior art invention not made by the alleged co-inventors of the patent; and

4. Whether the plaintiff failed to file a timely patent application disclosing the "best mode contemplated" by the alleged co-inventors of carrying out their alleged invention.

The defendants contend that the trial record adequately demonstrates that each of the four issues must be answered in the affirmative and that any one of them so answered requires a declaration of invalidity or unenforceability of the '230 patent.

## I. THE "ON SALE" ISSUE

### A. *The Nature of Plaintiff's Diffusion Coating Business*

From the time that the plaintiff was organized in 1951, it has engaged in the business of applying coatings to metals by means of a powdered pack diffusion coating process, known as "chromizing."[2] Chromizing is a process originally developed in England by Robert Lionel Samuel under which plaintiff was apparently licensed in early 1952.[3] The purpose of chromizing is to make common steels essentially stainless, by infusing chromium into their surface,[4] and thus to provide cheaper articles of mild steel with the surface characteristics of more expensive stainless steel.[5] To apply such diffusion coatings, a metal article is embedded in a powder mixture called a "pack," and sometimes called a "compound."[6] The pack contains (a) one or more metallic powders, some part of which transfers to and diffuses into the surface of the article being coated and thus forms the coating, (b) a chemical called an "energizer,"[7] the chemical effect of which is to accelerate the formation of the coating, and (c) an inert filler or diluent material to extend the volume of the pack and to prevent the active components from sintering into a brick-like consistency. The pack, with the metal article embedded, is enclosed in a container, called a retort, which is placed in a furnace and heated. A fusible powdered glass ultimately seals the contents of the retort from the atmosphere. Upon heating the energizer vaporizes, fills the retort and drives air out of the retort through the powdered glass that later fuses to form a liquid seal, and reacts with the metallic powder to form a vapor rich in chromium. The vapor contacts the surface of the article to be coated and deposits the metallic powder in the pack onto the article as a coating or "case," typically about 0.002 inch thick.[8]

As explained by Seelig in an article written by him entitled "Chromizing Improves Surface Property of Steels" and published in the May, 1953 issue of a magazine called "Materials & Methods," the diffusion coating pack may contain (1) a single metallic powder such as chromium or (2) a combination of metallic powder such as (a) a combination of chromium, silicon and aluminum or (b) a combination of chromium and aluminum.[9]

The type of diffusion equipment used and the manipulative technique of the pack diffusion processes are the same regardless of the article to be coated and whether the pack contains a single metallic ingredient such as chromium or combination of metallic ingredients as described by Seelig in the May, 1953 publi-

2. Sg. 138–141; Tr. 16, 429.

3. Sg. 1796–1800; Tr. 429.

4. Tr. 18.

5. Tr. 29–30. "Mild steel" is a low carbon commercial steel, almost iron. Tr. 29–30.

6. Tr. 19.

7. The "energizer" is a halogen, one of the four elements, chlorine, iodine, bromine and fluorine.

8. Tr. 17–20, 22–27, 40–41.

9. Tr. 312–314; DX 87, pp. 106 and 108.

cation.[10] However, the heating temperature and time at temperature may be varied. The purpose of such temperature and time variations is primarily to control the amount of diffusion coating to be applied. If a thicker coating is desired, a higher temperature or longer time period or both are used. If a thinner coat is sought, the temperature and time are adjusted accordingly.[11]

Using the above described technique, the plaintiff since 1952 has chromized a variety of articles for a number of customers under the trade designation of "Chromallizing"[12] and the diffusion coatings so applied were designated "Chromalloy" case for coatings applied to low carbon steels or "Chromacarb" case for coatings on high carbon steels and cast irons.[13]

Seelig joined the plaintiff as executive vice-president on September 19, 1952 and was primarily responsible for "sales and sales promotion."[14] By 1954, plaintiff had enlarged its sales organization to the point where it had allocated, under written contract and on an exclusive basis, the New England territory to William K. Duff ("Duff"), one of its field sales representatives.[15] The function of plaintiff's sales representatives was to sell plaintiff's diffusion coating work and services on a commission basis.[16]

From the time Seelig joined the plaintiff in 1952, the plaintiff was actively and continually seeking new business from varied customers in order to apply its diffusion coating process to customers' articles.[17] Wachtell testified that the plaintiff was continuously using "existing known procedures on new parts" to determine "whether an already commercial chromizing process" would work on these new parts or articles.[18]

By 1957, the plaintiff had retained an independent public relations consulting firm to publicize plaintiff's diffusion coating services.[19] On June 3, 1957 Seelig sent a memorandum to plaintiff's public relations firm to get the best possible coverage in the non-technical press of a diffusion coating process which plaintiff had developed and which was designated as "SA. Chromallizing" (the "SA process").[20] A news item appeared in the Wall Street Journal on August 22, 1957 entitled "Chromalloy Claims Way To Protect Jet Parts Against Extreme Heat" which touted plaintiff's SA process.[21] This news item was characterized by Seelig as a "sales pitch."[22] The pack of the SA process, which was invented in 1956,[23] used the three-metal combination of chromium, aluminum and silicon[24]— a combination that Seelig had described in his May, 1953 published article.[25]

B. *Development of Plaintiff's "SA" and "U Processes"*

The August, 1957 Wall Street Journal news item described plaintiff's SA process "as a modification of a patented method for infusing chromium into the surface of carbon steel. This new method applies only to high alloy steels including types used in turbine engines."[26] The modification consisted of a change from one to three metallic ingredients in the

10. Tr. 40; DX 87.

11. Sg. 1633, 1635; DX 7, pp. 8–9; DX 8, pp. 12–13.

12. Tr. 28, 431.

13. Tr. 318–20, 479–80; Sg. 749.

14. Tr. 428; Sg. 461.

15. Tr. 494; DX 68.

16. Tr. 493–494.

17. Sg. 128–130, 142, 144–145, 146, 148, 2669–2670.

18. Tr. 112.

19. Tr. 72, 327–330.

20. DX 88.

21. DX 16; Tr. 63–64.

22. Sg. 613.

23. Pre-trial Order, par. C. 8.

24. Tr. 68; Sg. 1784.

25. DX 87, p. 108.

26. DX 16. Wachtell disagreed that the SA process was applicable only to "high alloy steels" and stated it would have been used on "superalloys." Tr. 68–69.

pack.[27] By the time the August, 1957 news item in the Wall Street Journal appeared, the plaintiff had made a further modification which simplified the SA process pack by eliminating silicon from it so that the metallic ingredients were chromium and aluminum.[28] Plaintiff later called this simplification its "U process."[29] The metallic ingredients of the packs for both the SA and U processes had been forecasted by Seelig in his May, 1953 article.[30]

Plaintiff's SA process was jointly invented in 1956 by Wachtell and Charles De Guisto ("De Guisto"), two of plaintiff's employees.[31] While Wachtell could neither pinpoint or approximate the time in 1956 when he and De Guisto invented the SA process,[32] it had to be invented between February, 1956 when De Guisto was employed by the plaintiff,[33] and December 18, 1956, when Seelig, who then had the decision making power for filing patent applications,[34] advised the plaintiff's Board of Directors that a patent application for the SA process would be filed.[35] However, the filing of the application directed to the SA process was delayed for three more years and was not filed until May 16, 1960.[36]

Meanwhile, on July 3 or 4, 1957 the simpler and modified two-metal, (aluminum and chromium) pack process which later was called the U process was performed in a diffusion coating run (referred to as XP 2839) on Udimet 500 and

600 for General Electric Company.[37] Wachtell, who performed this run and determined the composition of the pack, apparently did not disclose it at the time to Seelig, the alleged co-inventor.[38] In supplemental answers to defendants' interrogatories, Wachtell stated that the U process, the subject matter of each of the claims of the '230 patent, was "actually reduced to practice" on "August 22, 1957" and was then disclosed to Seelig as a result of the diffusion coating run XP 2965.[39] That diffusion coating run and the earlier July 3 or 4, 1957 run [40] are identical in all respects including the pack ingredients, their proportions, the metal coated, and the customer for whom they were performed.[41]

A process is actually reduced to practice when it is successfully performed. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 383, 48 S.Ct. 380, 72 L.Ed. 610 (1928). Wachtell's answer to interrogatories that the U process was successfully performed bears out Seelig's testimony that the plaintiff had found the U process useful as early as the summer of 1957 and that the process produced a useful product, viz. a "coated metal" that was "oxidation resistant."[42]

When the process was actually reduced to practice on August 22, 1957, it was in connection with work for General Electric Company in placing a diffusion coating on superalloy metals known as

---

27. Tr. 18, 68; Sg. 1784.

28. Sg. 2203–2204.

29. Until October, 1957, plaintiff called its "U process" the "GE process" (PX 6). However, when plaintiff began using the process for Pratt & Whitney Division of United Aircraft Corporation, it changed the process name from "GE process" to "U process" (DX 80) by taking the first letter from the name Udimet 500, General Electric Company's superalloy. (Sg. 579–582).

30. DX 87, p. 108.

31. Pre-trial Order, par. C. 8.

32. Tr. 321.

33. Sg. 1613.

34. Sg. 2766; Wl. 47, Tr. 594–595.

35. DX 79; Sg. 2779–2780.

36. DX 26.

37. PX 27; Tr. 188–189; Wl. 90–91; Udimet 500 and 600 are nickel base superalloys of slightly different chemistry. (Tr. 38).

38. Tr. 189; Wl. 91, 96; DX 9.

39. Docket Item 18, p. 11; DX 11; Sg. 182–185.

40. PX 27.

41. PX 27; DX 11; Sg. 2179–2180.

42. Sg. 1647, 1650; Tr. 609.

Udimet 500 and Udimet 600.[43] General Electric had been a customer of plaintiff since 1952 and at first plaintiff's work for General Electric had been to chromize various mild steels for strip heater casings.[44] In 1956, General Electric asked plaintiff to attempt to coat General Electric's Udimet alloys to improve their oxidation resistance as these alloys were contemplated for use as blades in jet engines.[45]

Plaintiff first coated the Udimet alloys using the same chromium diffusion process it had used for General Electric's mild steels (the CR process) but found that process did not improve the oxidation resistance on Udimet alloys as it did for mild steels.[46] Accordingly, plaintiff turned to the use of packs containing instead of chromium alone (1) the three metal combination (chromium, aluminum and silicon) of the SA process, and (2) the two-metal combination (chromium and aluminum) which became the U process.[47] Wachtell testified that the SA process was specifically developed for the purpose of increasing the high temperature corrosion resistance of alloys used in jet engine gas turbine and internal combustion engines.[48] It was thereafter on August 22, 1957 that the U process was successfully reduced to practice in coating General Electric's Udimet alloys which greatly increased the oxidation resistance of those metals.[49]

Plaintiff having found that the SA and U processes were particularly adapted for coating the Udimet alloys used on jet engine blades, Seelig on October 21, 1957 decided to apply for a patent relating to the SA and U processes "as soon as possible."[50] Plaintiff's parent patent application for the U process, however, was not filed until April 17, 1959.[51]

## C. *Plaintiff's Activities Between August 22, 1957 and April 17, 1958*

35 U.S.C. § 102(b) provides in part:

"A person shall be entitled to a patent unless—

\* \* \* \* \* \*

"(b) the invention was . . . on sale in this country, more than one year prior to the date of the application. . . ."

The purpose of § 102(b) is to promote the public interest by requiring timely filing of patent applications in order, on the one hand, to prevent the application from extending the limited monopoly period granted by the patent, and on the other hand, to teach the public how it can practice the invention when the monopoly period has expired. The question becomes was the invention in the '230 patent sold, offered for sale, or in public use more than one year before April 17, 1959, the date the original application was filed.[52] The critical date therefore is April 17, 1958.

The defendants contend that the plaintiff's activities within the period conclusively demonstrate that the '230 patent is invalid by the time bar of § 102(b) because of plaintiff's business activities with National Carbon Company, a Division of Union Carbide ("National Carbon") and with Pratt and Whitney Aircraft, a Division of United Aircraft Corporation ("Pratt & Whitney").

National Carbon on November 14, 1957 wrote to the plaintiff requesting plaintiff to submit "cost quotation on 25, 50, 100, 250 and 500 pieces of 309 or 316 stainless steel plate which would be CR coated, SA coated and U coated."[53] On Novem-

---

43. Tr. 36–38.

44. Wl. 10–12; Tr. 17–29, 37.

45. Tr. 36-38, 51.

46. Tr. 39–40.

47. Tr. 53, 62.

48. Tr. 78–79.

49. Tr. 607–609; Sg. 1647–1649.

50. DX 80; Tr. 597–600; Sg. 2785.

51. DX 7.

52. DX 7.

53. DX 62. Stainless steels are alloy high temperature steels and alloys having about equal proportions of nickel, cobalt and iron. (Sg. 1474–1475). These are sometimes broadly referred to as "superalloys."

ber 22, 1957, Seelig computed the "charge," on the basis of the number of pieces to be coated, and the total charge quoted to National Carbon included a 20 percent profit.[54] On December 6, 1957, Seelig, responding to National Carbon's request, wrote:

*"This is to advise you that we have completed the advance runs on your material and all three CHROMALLIZING processes reacted properly with your alloy.* Accordingly, arrangements were made to process 2 plates each by our CR, SA and U CHROMALLIZING processes. Because of the large size of these plates production equipment has to be used for processing them. As we are very busy at the present time this has posed somewhat of a scheduling problem but we expect to be able to ship the entire lot on or about 10 December. In this connection I wish to point out that our production work as such is running on schedule at all times and prompt delivery is made to all our customers.*

*Pursuant to the request, contained in the second paragraph of your letter, we have made some preliminary cost calculations so as to give you an idea of the order of magnitude involved. A more precise quotation will have to wait until we know which of the three processes is most successful in your application. On this basis, we estimate that plates measuring 14 x 6½ x 1 inch can be processed in lots of 25 up to 100 pieces for 85 cents per pound, and in lots of over 100 pieces and up to 500 pieces at 55 cents per pound."* (DX 65) (Emphasis added.)

Plaintiff coated National Carbon's 316 steel plates (a stainless steel) by the SA and U processes and then shipped and invoiced them to National Carbon.[55] It will be noted on December 6, 1957 plaintiff gave an estimated cost quotation for future coating work to National Carbon.[56] However, National Carbon for undisclosed reasons was not further interested in plaintiff's coatings although, as Seelig testified, the runs were successful.[57]

In August, 1957, Pratt & Whitney became interested in a protection coating for a cobalt base superalloy known as WI–52.[58] Pratt & Whitney first learned of plaintiff's SA coating through the Wall Street Journal publicity inspired by plaintiff on August 22, 1957.[59] Later two Pratt & Whitney employees, J. Richard Foley ("Foley") and Edward Seaward ("Seaward") met with Seelig and Wachtell to discuss the possibility of plaintiff's coating several alloys which Pratt & Whitney was contemplating using as vanes and blades in jet engines.[60] Pratt & Whitney had found that the material WI–52 had better strength than the materials which it was currently using but that it did not have sufficient oxidation resistance at high temperatures.[61] As a result of the meeting, on September 30, 1957, Seaward wrote Seelig stating that he was having four pieces of WI–52, two pieces of Inco 713,[62] and a piece of pure columbium sent to plaintiff to be coated by the SA and U processes.[63]

The first coating runs performed by plaintiff on WI–52 using the U process [64] occurred on October 11, 1957.[65] On

(DX 9, Col. 5, lines 72–74 Tr. 32, 306, 307).

54. DX 64.

55. DX 66, 67; Sg. 2629–2631.

56. DX 65.

57. Sg. 2626.

58. Sg. 625–626; Sd. 16.

59. PX 1; Tr. 453.

60. Sg. 631–634; Sd. 17–19; Tr. 440, 449, 457–464; PX 2.

61. Sd. 8, 16, 29; Tr. 453, 457–459.

62. Inco 713 was a nickel base alloy manufactured by International Nickel Company which Pratt & Whitney contemplated using for jet blades. (Sd. 19; PX 2; Tr. 467).

63. DX 18; PX 6.

64. At this time the U process was called the GE process—see footnote 29, supra.

65. DX 19; Sg. 690–691.

October 26, 1957 Seelig wrote Pratt & Whitney that "we have apparently achieved remarkable results with your WI–52 alloy as evidenced by our own oxidation test" and that there may be "a choice between two processing procedures" for Pratt & Whitney to make,[66] namely a choice between the three-metal pack of the SA process and the two-metal pack of the U process.[67] Plaintiff charged Pratt & Whitney $580 for this coating work performed on the small tabs of metal originally sent by Pratt & Whitney.[68]

By November 4, 1957, Pratt & Whitney requested a price for the purchase of coatings for 50 or more jet engine vanes as well as a price for larger quantities.[69] Seelig, by telephone, quoted a price to Seaward of $1,440 for 50 vanes, or approximately $29 per vane, and gave a price estimate in larger quantities of possibly under $10 per vane.[70] Seaward then told Seelig that two engine groups were interested; that the potential volume of its business was such that if Pratt & Whitney chose to purchase plaintiff's coatings, plaintiff would be "swamped" with work.[71]

Again on December 19, 1957, when Seaward and Seelig discussed charges for coating large quantities of vanes, Seelig repeated to Pratt & Whitney his earlier estimate of a price range "between $10 per part to perhaps . . . twice as much." [72] During December, 1957 and early 1958, plaintiff continued to await Pratt & Whitney's decision as to whether it wanted further coatings by the SA or U process or both after their evaluation.[73] At that time Seelig testified that the plaintiff was prepared to do coating work on vanes by either the CR process, the SA process or the U process.[74]

By February 10, 1958, Seaward informed Seelig by telephone that a Pratt & Whitney WI–52 vane coated by the U process at a temperature of 1950° F. for 20 hours [75] had passed 250 cycles of Pratt & Whitney's thermal shock test; that the temperature reached in the course of the test was as high as 2000° F.; that the samples were "okay"; that the test was continuing; that the full test consisted of 330 cycles plus 20 hours steady temperature exposure at 2000° F.; [76] and that Seaward expected the end point to be reached the following Wednesday.[77] On the following Wednesday, February 12, 1957, Foley, Seaward's supervisor, telephoned Seelig to discuss plaintiff's quotation for quantity coatings.[78] Seelig's notes of that telephone conversation headed "Prod. Cost" and his testimony regarding that discussion indicates that Foley told him the prior production cost estimates quoted by Seelig of $10 per coated vane appeared high to Pratt & Whitney; that Pratt & Whitney was "viewing costs more suspiciously than before" because the purchase of coatings was now being considered for commercial aircraft as well as military aircraft, as to which cost for the latter had presented no problem; that Pratt & Whitney had a backlog of 2,000 engine orders; that coatings of 10,000 vanes per month were mentioned; that one application for which Pratt & Whitney was evaluating plaintiff's coating process "was coming close to fruition" though in this regard "the volume of work was extremely low." [79]

The next day on February 13, 1958 Seaward wrote Seelig that Pratt & Whitney's evaluation testing was successful in that the U coated WI–52 vane had withstood "330 cycles of thermal shock and an

---

66. DX 21.

67. Sg. 726.

68. PX 4; Tr. 472.

69. DX 22; Sg. 774–775.

70. DX 22; Tr. 498–499; Sg. 801–802.

71. DX 22; Tr. 502; Sg. 776, 807–808.

72. DX 25; Sg. 1342–1343.

73. Sg. 1211.

74. Sg. 1251A–1251B, 1282–1284.

75. PX 23; Sg. 2190–2191.

76. Sg. 2190.

77. DX 28; Sg. 2183–2185.

78. Sg. 2107.

79. DX 27; Sg. 2106–2132.

additional 20 hours of steady state running at a metal temperature of 2000° F. There is no oxidation of the base metal at this time; however, there appears to be several small cracks on the coating at the Trailing Edge and a small area at the Leading Edge which is about ready to blister or spall off." [80] Wachtell testified that he received this "good news" orally and that he discussed it with Seaward.[81] Wachtell later wrote of the successful Pratt & Whitney tests of the U process and the fact that the hairline cracks were not considered serious by Pratt & Whitney as they appeared only at the end of the test, not being present at any of the intermediate examinations made during the first 300 or so cycles.[82]

On February 13, 1958, after Foley's telephone call and the date of Seaward's letter, Seelig prepared a detailed calculation which he entitled "Cost calculation for U Chromallizing of [Pratt & Whitney] vanes." The amount Seelig arrived at was a per vane costing figure of $2.20 which included a gross profit of 25 percent.[83] After this computation, Seelig wrote Foley on February 17, 1958 the coating price to be charged based on his February 13 calculation.[84] Seelig, in his letter first noting that "ultimate processing procedures had not been decided" and then suggesting that such things as "exact compound composition," "precise time/temperature cycle" and "reactivation procedure" may affect costs, nevertheless did positively state: "We are now certain that the actual charges" for U process coatings in the area of 10,000 vanes per month "will be under $5.00 per vane." [85] Plaintiff was prepared to go into production with the U process on

February 17, 1958, subject only to Pratt & Whitney's approval [86] and Seelig further suggested that the $5.00 price be reviewed after substantial production lots had been run.[87] On March 7, 1958, Richard Briggs of Pratt & Whitney's Production Purchasing Department advised Seelig that Pratt & Whitney was planning to issue plaintiff a purchase order on the basis that Seelig had last outlined.[88] Briggs also indicated that the monthly quantity of vanes to be U process coated would range from 1,000 to 1,500 and would increase to 3,000 later.[89]

On March 11, 1958, Seelig, in anticipation of Pratt & Whitney's production quantities, prepared a per vane price schedule based upon quantities as follows: up to 1,000 vanes to be coated per month, $9.70 per vane; 1,000 to 5,000 at $7.20 per vane and 5,000 to 10,000 at $5.70 per vane.[90] This quantity price quotation was given to Pratt & Whitney on March 13, 1958.[91] Upon receipt of this, Mr. E. E. Champion of Pratt & Whitney's Purchasing Department complained that this quantity pricing was "too high" and inferred that plaintiff was trying to take them "for a ride." [92] Thereafter, on March 21, 1958, Seelig adjusted the quantity price quotation so that by April 9, 1958, plaintiff's price for U coating under 1,000 vanes per month was $9.70 per vane, for 1,000 to 3,000 per month $5.70 and for more than 3,000 vanes per month $5.00.[93] These were the exact prices which plaintiff thereafter charged Pratt & Whitney for U coating vanes.[94]

80. DX 29.

81. Tr. 343–349.

82. PX 32, p. 3.

83. DX 31; Sg. 2202.

84. DX 30, 31; Sg. 2196–2207.

85. DX 30; Sg. 2205.

86. Sg. 2222–2225.

87. DX 30, p. 2.

88. Sg. 2295; DX 37.

89. DX 37.

90. DX 39; Sg. 2309–2310.

91. DX 44; Sg. 2394, 2436–2438.

92. DX 42; Sg. 2360.

93. DX 44; Sg. 2392–2394; DX 47.

94. DX 54, 93, 95, 96, 97, 98.

D. *Plaintiff's U Process, The Subject Matter of the '230 Parent Patent Application Was "On Sale" More Than One Year Before The Application Was Filed*

■ From the above detailed factual findings and the logical inferences arising therefrom, the Court concludes that the U process, the key subject matter of the '230 patent, was "on sale" more than one year prior to the statutory cut-off date of April 17, 1958. The U process was reduced to actual practice on August 22, 1957 when plaintiff successfully coated a nickel base superalloy, known as Udimet 500, for the General Electric Company. The process produced a useful product, namely a coated metal that greatly increased the oxidation resistance of such metals. Recognizing the utility of the U process, Seelig, one of the co-inventors, decided in October, 1957 to patent the process. Immediately after actually reducing the U process to practice, plaintiff offered to sell and in fact made sales of U type coatings as outlined above to National Carbon Company and Pratt & Whitney between August 22, 1957 and before April 17, 1958. When an invention is offered for sale more than a year before the patent application is filed, it is "on sale" within the meaning of 35 U.S.C. § 102(b), even if an actual sale has not occurred. This is true, even when (a) but one offer has been made to but one customer; (b) the prices are only estimated rather than established; (c) no commercial production runs have been made; and (d) the alleged invention is never sold. Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., 274 F.Supp. 993 (E.D.Mich.1967), aff'd 409 F.2d 99 (C.A.6, 1969); Philco Corp. v. Admiral Corp., 199 F.Supp. 797, 814 (D.Del.1961); Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., 165 F.Supp. 307 (M.D.Ga.1958); Wende v. Horine, 225 F. 501 (C.A.7, 1915). The facts are inescapable that plaintiff for more than a year prior to filing the parent patent application actively attempted to sell its U process coatings for superalloy metals and therefore the patent is invalid under 35 U.S.C. § 102(b).

The plaintiff, seeking to avoid this conclusion, has advanced several contentions, none of which has merit.

First, the plaintiff contends that it was not until April 30, 1958, when Pratt & Whitney initiated the production order for coating 300 jet turbine vanes by a request for quotation,[95] that the patentable utility of the U process was established and thus it was not until after that date that the patent application could have been filed. This contention, however, is based upon the erroneous premise that the claims of the '230 patent are directly solely to the coating of Pratt & Whitney's jet engine *vanes* made of a cobalt based superalloy, WI–52. The '230 patent does not limit the process to coating jet engine vanes.[96] The title of the patent is "Diffusion Coating For Metals"; neither its specifications or claims call for the coating of jet engine vanes or any other specific article. In fact, when plaintiff filed the parent application on April 17, 1959, it did so without disclosing coating of Pratt & Whitney vanes or even the U process coating of the metal WI–52 of which the vanes were made.[97]

Moreover, plaintiff's attempt to suggest an essential relationship between Pratt & Whitney's WI–52 jet engine vanes and the 1959 parent application of the '230 patent fails because the patentable utility of the U process had been established in August, 1957 before plaintiff ever heard of WI–52 metal and before any work had been done on Pratt & Whitney's jet engine vanes. In fact, Seelig testified that the first "useful product" produced by the U process was the diffusion coating placed on the nickel base superalloy, Udimet 500, for General Electric Company in August, 1957.[98] Seelig further testified that it was in the summer of 1957 that plaintiff found

**95.** DX 97, 99.

**96.** DX 9.

**97.** DX 7.

**98.** Tr. 607–609.

that the U process produced "surprisingly enhanced" oxidation resistance to Udimet 500.[99] The oxidation resistance testing performed by plaintiff in the summer of 1957 was of approximately 150 hours duration at approximately 2000° F.[100] While the plaintiff now characterizes that testing as "crude," [101] it was a more rigorous testing than was conducted by the plaintiff in 1963 and set forth in the Butler affidavit [102] which convinced the Patent Office of the patentability of the U process.[103]

Further, Seelig, recognizing the usefulness of the U process for coating high temperature resisting alloys to give them greater oxidation resistance, decided in October, 1957 to apply for a patent. When the parent application was later filed on April 17, 1959, it disclosed the nickel base superalloy Udimet 500 which had been satisfactorily coated in 1957 for General Electric and it made no disclosure of WI–52 vanes which were coated for Pratt & Whitney in 1958 and early 1959.[104] Thus, plaintiff's contention that "Chromalloy was obligated under 35 U.S.C. § 101 to establish the usefulness or 'utility' of the U coating on WI–52" before filing its first patent application is not supported by the record.

Second, even if it were assumed, as plaintiff argued, that the patentable utility of the U coated Pratt & Whitney WI–52 vane was relevant in filing the parent patent application, such utility had been established prior to April 17, 1958. Prior to this latter date (a) plaintiff had coated WI–52 vanes, (b) by February 12, 1958, the 330-cycle thermal shock test applied by Pratt & Whitney had been passed, (c) that on March 17, 1958 Pratt & Whitney and plaintiff jointly drafted a U process coating specification for WI–52 vanes, (d) that on March 21, 1958, the prices which Pratt & Whitney in fact paid for the U coating vanes on the basis of monthly quantities, were quoted by plaintiff and established. These facts, even if standing alone, clearly establish the patentable utility of the U process to the WI–52 vanes before the April 17, 1958 cut-off date. In any event, these facts are of little consequence because the patentable utility of the U process had been indisputably established in 1957 in the coating work for General Electric.

■ Plaintiff appears to take the position that the first patent application could not be filed until the U process had attained "commercial scale production orders" with Pratt & Whitney which did not occur until after April 17, 1958.[105] Of course there is no merit to this contention. A patent application may be barred even before the invention goes into "commercial scale production." Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755 (1881); Atlas v. Eastern Air Lines, Inc., 311 F.2d 156 (C.A.1, 1962); Application of Gay, 309 F.2d 769, 773, 50 C.C.P.A. 725 (1962); Philco Corp. v. Admiral Corp., 199 F.Supp. 797 (D.Del. 1961).

Third, plaintiff argues that prior to April 17, 1957 plaintiff's cost quotations to Pratt & Whitney were not firm quotations but merely estimates and that plaintiff was dealing with "Pratt & Whitney engineers." This is of no help to plaintiff. The record is clear that prior to April 9, 1958 Seelig had quoted the $5.00 per vane price for production quantities to Pratt & Whitney.[106] However, quoting an "estimated price range"

99. Sg. 1647, 1650.

100. Sg. 1647–1649.

101. Pl.Br. pp. 8, 16.

102. DX 7, pp. 38–55.

103. The 2000° F. temperature used in 1963 by Butler was the same temperature as used in 1957 but for a far shorter duration as contrasted with the 150 hours oxidation testing successfully run in 1957, the test data given the Patent Office in the Butler affidavit consisted of comparisons after exposures ranging from a high of 88.25 hours to a low of 17.5 hours. (DX 7, pp. 44–48).

104. DX 7, p. 6, line 20 to p. 7, line 1.

105. Pl.Br. pp. 26–27.

106. Tr. 666–667; Sg. 2394.

even when final prices have not been established still does not prevent an invention from being "on sale." Philco Corp. v. Admiral Corp., supra at 814. Further, while quotations were given to Pratt & Whitney engineers prior to April 17, 1958, Seelig also quoted and modified plaintiff's prices when negotiating with Pratt & Whitney's Director of Purchases prior to the cut-off date.[107]

Finally, plaintiff contends that the U process invention must be considered experimental until "commercial scale production orders" are received [108] and since such a production order was not received until April 30, 1958 for Pratt & Whitney vanes, this later date was the earliest time possible that the U coatings of Pratt & Whitney vanes could be considered beyond the "experimental stage." The record does not support this contention. Commercial scale production orders are not necessary to mark the end of experimental use of the U coatings. Even if the plaintiff never received a commercial scale production order, this would not alter the non-experimental character of the U coated vanes offered for sale by plaintiff to Pratt & Whitney before April 17, 1958.

The record in this case clearly demonstrates that before the April 17, 1958 cut-off date the plaintiff had offered to sell its U coatings on Pratt & Whitney WI–52 vanes. Plaintiff was convinced by its own tests run in the fall of 1957 that U coatings of the WI–52 metal were successful. Indeed on February 17, 1958, plaintiff wrote Pratt & Whitney that the coating could be produced for under $5 per vane and urged Pratt & Whitney to permit plaintiff to go into production at that rate—production which plaintiff has admitted it was then prepared and anxious to provide.[109] The fact that plaintiff did not then go into "commercial scale production" for Pratt & Whitney until after April 17, 1958 (which is irrelevant in any event)

was because Pratt & Whitney desired to further evaluate the U process coating. This desire on Pratt & Whitney's part in no way derogates from the "on sale" status of the U process before April 17, 1958.

The law is well established that "the question of whether the use of an invention is experimental is basically a question of the intent of the patentee or the inventor"; it does not depend on the intent of the prospective customer or vendee. Philco Corp. v. Admiral Corp., supra, 199 F.Supp. at 817; Tool Research and Engineering Corp. v. Honcor Corp., 240 F.Supp. 296, 301 (S.D. Cal.1964), aff'd 367 F.2d 449 (C.A.9 1966), cert. den. 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972, reh. den. 389 U.S. 893, 88 S.Ct. 17, 19 L.Ed.2d 203 (1967). Thus, any tentativeness on Pratt & Whitney's part as to whether it would order commercial scale production of plaintiff's U coating for its WI–52 vanes or whether it wished to conduct further evaluation of the process has absolutely no bearing upon the question whether this was good faith experimentation on the part of the plaintiff.

The Court therefore concludes that prior to April 17, 1958, the cut-off date, plaintiff had discovered that the U process had utility as an oxidation resistant coating for superalloys, that plaintiff was willing and able to go into commercial production for coating of superalloys and in fact quoted prices and was eager to sell its U coatings to at least three prospective customers.

Accordingly, the Court concludes that the '230 patent is clearly invalid because the plaintiff in violation of 35 U.S.C. § 102(b) placed the U process, the subject matter of the patent, "on sale" in this country more than one year before the plaintiff applied for the patent.

107. Tr. 663–664; DX 42; Sg. 2360.

108. Pl.Br. 19–22; 26.

109. Sg. 2225.

## II. FRAUD ON THE PATENT OFFICE

The defendants contend that the co-inventors in applying for the '230 patent, made false representations as to material facts and affirmatively mislead the Patent Office into issuing an invalid patent. In support of their position, the defendants point to a number of alleged misrepresentations. For the purpose of this affirmative defense, however, the Court need consider only a few of the alleged misrepresentations.

### A. The CIP Oath

The '230 patent, issued on June 21, 1966, was based on an application filed March 24, 1964; that application was a continuation-in-part application ("CIP") filed while the parent application, originally filed on April 17, 1959, was co-pending.[110] The parent application was thereafter abandoned in favor of the CIP application.[111] The oath filed by the co-inventors, Seelig and Wachtell, in the CIP was false in material respects. The applicable form of oath of the Patent Office in March, 1964, namely Form 18, required the applicants to identify any previously filed foreign patent application corresponding to the United States parent application filed April 17, 1959.[112] The oath actually filed by Wachtell and Seelig, however, stated in part:

" . . . no application for patent on said invention [subject matter common to the parent application] has been filed by us or our representatives or assigns in any country foreign to the United States . . . ."[113]

Actually the facts then existing were directly to the contrary. The plaintiff had filed between April 11th and 19th, 1960 eight foreign patent applications corresponding to the April 17, 1957 U process parent U. S. application.[114] Further, the British application, which corresponded to the U. S. parent application, matured into British Patent Specification No. 911,414 which was printed and published on November 28, 1962.[115] The record is clear that the plaintiff and the applicants knew the facts concerning the filing of the foreign application when the oath was made.[116] Plaintiff's patent attorneys who arranged for filing the April, 1959 parent U. S. application also arranged for filing the 1960 corresponding foreign applications and the March, 1964 CIP.[117]

Joseph Schimmel,[118] defendants' expert witness, testified not only that the foreign counterparts of the U. S. parent application should have certainly been disclosed in the CIP, as the oath required, but also that if the U. S. Patent Office had discovered the 1962 publication of the British counterpart, that knowledge would have formed the basis for rejecting all of the CIP claims.[119]

The plaintiff seeks to avoid the impact of the misrepresentation that no foreign application had been filed when the CIP oath was executed on two grounds: (1) that the failure to disclose

---

110. Pre-trial order par. C–3 (Docket Item 92, p. 2) ; DX 8.

111. Id.

112. DX 101; cited in the Fed.Reg. of Dec. 22, 1959 as § 3.18 (DX 100).

113. DX 8, p. 34. The oath was specially typed for the occasion (DX 8, pp. 34–35). When Seelig signed, he made a handwritten correction in his address, initialled the change and dated it 3–19–64 (DX 8, p. 35). Wachtell testified that both he and Seelig read the oath before executing it. (Tr. 268).

114. Pre-trial Order par. C–6. Plaintiff had filed foreign applications in Canada, France, West Germany, Great Britain, Italy, Japan, Sweden and Switzerland.

115. DX 76.

116. Tr. 268–270, 388.

117. Tr. 592–594.

118. Mr. Schimmel served in the Patent Office for 45 years from 1924 to 1969 first as patent examiner, then as a chief examiner, attorney in the Solicitor's Office of the U.S. Patent Office, Deputy Solicitor and finally as Solicitor of the Patent Office. (Tr. 813–835).

119. Tr. 857.

was "inadvertent" and (2) the misrepresentation was not "material."

While it is true that Wachtell and Seelig testified generally that they did not deliberately or intentionally withhold the disclosure of the foreign applications,[120] the record does not bear out the conclusion that the misrepresentation was inadvertent. The oath on its face appears clear.[121] Both Wachtell and Seelig are sophisticated and intelligent business men with some familiarity with patent law who read the oath before it was signed.[122] The application was prepared by their patent counsel and the oath specifically retyped in the form in which it was filed for their signatures. Both signed when it was submitted by their counsel. It was the same patent counsel who filed the parent application in 1959 who also filed the foreign patent applications and the CIP application. It stretches credulity too far to believe that both inventors and their patent counsel could have overlooked disclosing the foreign patent applications in the CIP oath.

Both Wachtell and Seelig knew the true facts when the oath was executed, and Wachtell testified he knew the materiality of the oath.[123] Thus, even if the oath signers had any difficulty in understanding it, they certainly had a duty to inquire into its meaning or to rely upon their attorneys and accept the consequences. If still there was the slightest question of revealing the foreign patents, there existed an uncompromising duty to resolve all doubts in favor of disclosure. SCM Corporation v. Radio Corp. of America, 318 F.Supp. 433, 449–450 (S.D.N.Y.1970).

In this regard it is significant to note that in 1969 after this case was brought plaintiff refused to respond to defendants' Interrogatory 11 which inquired whether there was any—

". . . misstatement present in the Patent Office file of the patent in suit including the file of its parent application, and if so, set forth each such error and misstatement." [124]

Plaintiff in refusing to answer this interrogatory stated:[125]

"Answer: Plaintiff declines to assume the burden of this task since defendants or their counsel presumably can check the documents in the Patent Office file relating to the patent in suit without difficulty, all of said documents being matters of public record."

It was not until May, 1969, after a Rule 37(a) order [126] was entered by the Court, that plaintiff supplemented its answer to defendants' Interrogatory 11 as follows:[127]

"Answer: Plaintiff is not aware of any uncorrected errors or misstatements present in the Patent Office file of the patent in suit and the file of its parent application, except that there appears to be an inadvertent omission in the Oath attached to the application for the patent in suit, the omission being an identification of foreign applications corresponding to the patent application, which foreign applications are identified in the previous answer to Interrogatory No. 10(a)."

The belated claim of an inadvertent omission in the CIP patent application oath appears to be an obvious fiction. Even by giving the applicants the benefit of the doubt and assuming that the eight foreign patent applications and the issued British patent corresponding to the U. S. parent application were inadvertently overlooked when the oath was orig-

---

120. Tr. 264–270, 387–389, 590–592, 593–594.

121. DX 8, pp. 34–35.

122. Tr. 267–268.

123. Tr. 268–270.

124. Docket Item 4.

125. Docket Item 10, p. 11.

126. Docket Item 17.

127. Docket Item 18, pp. 6–7.

inally executed and submitted in March, 1964, it is convincingly clear that the CIP applicants made absolutely no effort thereafter to correct the false oath during the two year period of prosecuting the CIP application in the Patent Office although later events indicate that the oversight was brought to the attention of the applicants and their counsel. This is further supported by the active resistance made by the applicants to disclosing the error in the oath in the present litigation.

### B.  *Affirmative Misrepresentation*

On January 8, 1965, the patent examiner rejected Claims 9 through 14 (claims which broadened the original claims of the parent application) on various grounds including unpatentability over the SA process patent [128] (3,073,-015).[129] The examiner specifically "noted that applicant is not entitled to the filing date of application Serial No. 807,-025 [the parent application], for rejected claims since the generic disclosure [of the CIP] was not present in that application." [130]

To overcome this rejection, plaintiff on May 7, 1965, stated that the U process of the parent application and the SA process of the '015 patent were each *species* of the *genus* disclosed in CIP application. Plaintiff then represented that the U process invention of the parent case antedated the SA process invention of the '015 patent and that Seelig and Wachtell jointly were the first inventors of *any* species within the genus.[131] These representations were clearly false. The SA process was invented in 1956 jointly by Richard L. Wachtell and Charles A. De Guisto,[132] while the U process of the parent and CIP application for the '230 patent was

invented later in 1957 by different inventors, Wachtell and Seelig.[133]

These false affirmative statements completely misled the examiner in two major respects. First, since the plaintiff insisted that the parent application was a species of the broadened generic Claims 9 to 14, it was extremely important to disclose to the examiner that the plaintiff's British patent counterpart to the parent application had issued in 1962. This, of course, was never disclosed to the Patent Office. The highly material British counterpart patent should have been disclosed because being a species of the CIP genus, it was closer prior art than any of the other references cited by the applicants to the Patent Office.[134]

More importantly, however, on October 11, 1965, the examiner again rejected the broadened Claims 9–14 of the CIP citing In re Steenbock, 83 F.2d 912, 23 C.C.P.A. 1244 and In re Ruscetta and Jenny, 255 F.2d 687, 45 C.C.P.A. 968, authorities which clearly called for the disclosure of a patent such as the British counterpart.[135]

The cases, In re Steenbock, 83 F. 2d 912 (C.C.P.A., 1936), Application of Ruscetta and Jenny, 255 F.2d 687 (C.C. P.A., 1958) and Application of Lukach, 442 F.2d 967 (C.C.P.A., 1971), hold that when a CIP includes new claims which the parent case did not adequately disclose and those claims embrace some of the subject matter of the parent, the new claims must stand or fall on the later CIP filing date. They are not entitled to the earlier filing date of the parent application. 35 U.S.C. §§ 112 and 120.

In their submission to the Patent Office on March 10, 1966, plaintiff's attorneys recognized the holdings and impact of *Steenbock, Ruscetta* and *Lukach*.[136] But these cases also hold

---

128. DX 8, pp. 45–47.

129. DX 26.

130. DX 8, p. 46.

131. DX 8, pp. 49–50; Tr. 854–855.

132. Pre-Trial Order, par. C. 8.

133. PX 27; Tr. 188–190, Wl. 90–91; Pre-Trial Order, pars. C. 3, C. 4, and C. 8.

134. Tr. 857–858.

135. DX 8, p. 54.

136. DX 8, p. 61, lines 7–10 and DX 8, p. 61, lines 15–17.

that, if there is an intervening publication of a foreign counterpart of the parent application and the publication occurs more than one year before the CIP is filed, then the new claims of the CIP are automatically barred under 35 U.S.C. § 102(b) because the disclosure of a single species in a reference does in fact anticipate the genus. Thus, since the British patent, a counterpart of the parent application disclosing a species, was published in 1962, there was no way for the plaintiff to overcome the statutory bar to the new and broadened Claims 9–14 of the CIP had the British patent been disclosed to the Patent Office. To avoid the statutory bar, specifically brought to the applicants' attention by the examiner, applicants concealed the fact of the publication of the British patent more than two years before the filing of the CIP application. This fact was extremely material to the issuance of the '230 patent. If it had been disclosed it would have barred the broader CIP claims.[137] The Court, therefore, must conclude that the failure to disclose the British patent, first in the original oath and then when specifically called for during the prosecution of the patent, constituted a fraud upon the Patent Office. SCM Corp. v. Radio Corp. of America, 318 F.Supp. 433 (S.D.N.Y. 1970); Monsanto Company v. Rohm and Haas Co., 312 F.Supp. 778 (E.D.Pa. 1970), aff'd 456 F.2d 592 (C.A.3, filed Jan. 12, 1972); United States v. Saf-T-Boom Corp., 164 U.S.P.Q. 283 (E.D.Ark., 1970), aff'd 431 F.2d 737 (C.A.8, 1970).

Plaintiff now advances the untenable argument that "the parent application does not disclose the subject matter" of the broader Claims 9 to 14 of the '230 patent and that the British counterpart is "overcome because there was no disclosure of any species of the buffering process of claims 9 to 14 in the British patent."[138] This argument does not stand up. The invalidity of Claims 9 to 14 does not turn on whether the parent application discloses the subject matter of Claims 9 to 14, but rather upon (1) the fact that Claims 9 to 14 during the prosecution of the patent were represented by the applicants as *generic* claims embracing within them the parent case as a *species* of those claims and (2) the fact, suppressed by the applicants, that the *species* of the parent was published, in November, 1962, in the British patent, the counterpart to the parent application. Had the British patent reference been cited to the Patent Office it would have been sufficient to prevent the allowance of the generic claims of the CIP. Intentionally withholding this material reference, under the circumstances of this case, transgresses the equitable standards of conduct owed the public by the applicant and amounts to fraud.

Plaintiff further argues that even if Claims 9 to 14 of the '230 patent are unenforceable because of misrepresentation, Claims 1 to 8 are unaffected. This argument is without merit. The enforcement statute, 35 U.S.C. § 288, provides:

"Whenever, *without deceptive intention,* a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid. The patentee shall recover no costs unless a disclaimer of the invalid claim has been entered at the Patent Office before the commencement of the suit." (Emphasis added.)

Thus, § 288 by its express terms rules out infringement actions to enforce a patent in which any one of its claims is invalid by reason of fraud or deception. This was the holding in Strong v. General Electric Co., 305 F.Supp. 1084 (N.D.Ga.1969), aff'd 434 F.2d 1042 (C.A. 5, 1970), where a prior publication invalidating some but not all of a patentee's claims was fraudulently withheld from the Patent Office. To the same effect is Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933) where the Supreme Court, finding that the plaintiff had arranged to suppress information in re-

137. Tr. 855–857.

138. Pl.Br. pp. 44, 47.

spect to a close prior use which affected the validity of only one of plaintiff's five patents, applied the unclean hands doctrine and struck down all five closely interrelated patents.

The facts of the present action are far more persuasive than those of *Keystone Driller*. All 14 claims of the '230 patent are much more closely related than the five separate patents in *Keystone Driller*. The '230 claims are all directed to plaintiff's U process with varying degrees of breadth.

The Court finds that the failure to disclose the highly material information during the prosecution of CIP application, which, if disclosed, would have rendered Claims 9 to 14 invalid, amounted to intentional concealment which permeated all of the interrelated claims of the patent, including Claims 1 to 8 originally allowed in the parent application and allowed in the CIP. This, thereby, renders all of the claims of '230 patent unenforceable. The failure to disclose material information amounted to misrepresentation transgressing equitable standards of conduct owed the public by the applicant in return for the patent monopoly granted. Monsanto Company v. Rohm and Haas Company, 456 F.2d 592 (C.A.3, filed Jan. 12, 1972). The inequitable conduct in the particulars discussed have been proved in this Court's opinion by clear, unequivocal and convincing evidence.

In view of this conclusion, it is unnecessary to discuss the innumerable other alleged misrepresentations claimed by the defendants to have been perpetrated upon the Patent Office. Accordingly, the Court finds that the '230 patent is unenforceable by reason of inequitable conduct in the prosecution of the '230 patent.

Because it has been determined that the '230 patent is invalid based on the "on sale" provision of 35 U.S.C. § 102(b) and that the patent is also unenforceable because it was obtained from the Patent Office by clearly inequitable conduct, the Court need not pass upon the other two separate and independent grounds which the defendants claim as reasons for invalidating the patent.

The above shall constitute the findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

Submit order.