## UTILITIES SERVICE, Inc., v. WALKER.
### No. 5580.

Circuit Court of Appeals, Third Circuit.
April 23, 1935.

James K. Peck, of Scranton, Pa. (Edward A. Hathaway, of Philadelphia, Pa., of counsel), for appellant.

William M. Reese, of Philadelphia, Pa., for appellee.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court holding that John H. Walker, defendant, was the original and sole inventor of the device in question and ordering the Commissioner of Patents to issue a patent to Walker for the invention and the plaintiff to assign all its right, title, and interest therein to Walker. The case is here on appeal from this decree.

The evidence shows that in the spring of 1914 John H. Walker conceived the invention here in question, which is a device for automatically furnishing emergency electric lights for exits for theaters and other places of public gathering when the regular source of electric current supply is interrupted, in order to prevent panics which might occur if such places were unexpectedly plunged into total darkness.

In March of 1914 Walker made a sketch of his device, described and explained it to one Maxwell H. Hite and to his own brother, Edward A. Walker. In the following year he described and explained it to one Chester Labarre. In 1918 Walker explained his invention to Harry S. Echternach, an electrical engineer and mechanic, and employed him to develop and perfect the invention into an operative, practical device for the purpose for which it was intended.

Mr. Echternach during 1918 and 1919 worked on the device and constructed a model which partially functioned and produced some light, but he was unable to devote much time to the work and consequently made slow progress.

In the year 1918 Joseph L. Dunn introduced Walker to Franklin C. Joutras, who was represented to be an honorable man of good repute and a mechanical engineer who had ample facilities to develop and perfect the invention quickly. Thereupon Walker entered into an oral contract with Joutras wherein it was agreed, in the presence of Dunn, by and between Walker and Joutras, that Joutras at his own expense would develop, build, and perfect the invention until it became a practical device for the purposes for which it was intended. When it was thus fully developed, Joutras, at his own expense, was to have the invention patented in the name of Walker, who was to assign to Joutras an interest in the profits to be derived from the sale of the units embodying the invention. Walker was to deliver to Joutras all data, drawings, and details of the invention so that Joutras could immediately begin the work of developing the invention.

Accordingly, on December 18, 1919, Walker and Echternach explained and described the invention in detail (so far as it then could be done) to Joutras and delivered to him all drawings, sketches, data, and descriptions of the invention. The following day Joutras wrote to his friend, Dunn, telling him of the receipt of these things. At that time there was no intimation whatever of any kind indicating that Joutras had the slightest previous conception of the invention.

He began the work of developing the invention, and continued until September 11, 1921, when he advised Walker that the solenoid was overloaded and that he was having trouble with it and also with the water turbine because of the backlash or pressure. Joutras then made requests of Walker for further drawings and suggestions as to how these troubles could be overcome. Walker, on September 21, 1921,

pursuant to the request, went to Hoboken, took two more drawings, and fully explained them to Joutras, who seemed to work slowly and indifferently to perfect the device. In 1924 and 1925, however, he built about eight of the devices, and installed them in various places in Pennsylvania, for experimental purposes only, but not one of them worked properly. It required time, patience, and skill to perfect this device. The reasons for this are set forth in Walker's brief as follows:

"A device to automatically furnish emergency electric exit lights for places of public gathering, when the regular source of electric current supply might be interrupted, and thereby prevent panics which would occur if such places were unexpectedly plunged into total darkness, which panics usually result in loss of human life and much injury to persons, and due also to the variable conditions under which such invention would have to be installed in various places, such as the variable water pressure at various places; the variable temperatures at different places and times; the variable differences of care and lack of care given to the device at different places and times; the variable lengths of time when such devices would remain non-operating or not functioning, by reason of the outside or main source of electric current supply not being interrupted, sometimes lasting for years, in which time the device would not be called upon to function and would remain idle and subject to corrosion and other deleterious effects and lack of care and attention; required that such device be developed to the highest possible state of efficiency.

"It was necessary that long and varied experimental use and tests under variable conditions and at various places be made of said invention, which tests and experiments could not be made in a laboratory, as all of the various conditions could not be duplicated, before it could, with any reasonable degree of moral certainty or good conscience, be claimed to be a useful or practical device for the purpose for which it was intended and invented. Any failure of the invention to function, if the outside source of electric current supply should be interrupted, would probably result in a panic, death of persons and much injury to human beings. Therefore, in good conscience, no one could or should apply for a patent on such an invention until it was fully perfected and proved by long and varied experimental and actual use and tests to be efficient and wholly dependable, regardless of the various conditions under which it was installed."

In 1926 the invention as conceived by Walker was fully developed and perfected by Joutras, his employees and assistants, without any substantial changes or the addition of other elements.

Without the knowledge of Walker and in violation of his agreement with him, Joutras and his business associate, James Landers, on or about April 1, 1922, secretly made application in their own names to the United States Patent Office for a patent for Walker's invention. This application they assigned to the Central Station Equipment Company, of which Joutras was vice president and Landers secretary, on October 25, 1925. On May 14, 1926, the Central Company sold the exclusive right to the invention to the Utilities Service, Inc., plaintiff herein.

On October 21, 1927, within two years of the time when Walker claimed the invention had become perfected, he made application for a patent for the invention as the sole and original inventor of the "Hydro-Electric Emergency Lighting Device," or as designated in the application as an "Emergency Lighting and Power Unit," which was substantially the invention for which Joutras and Landers had made application. Thereupon the Commissioner of Patents declared an interference. The interference examiner and the law examiner found that Walker was the sole and original inventor, but that he was not entitled to letters patent because the invention had been in public use for more than two years before he filed his application.

The plaintiff, who claims to own the invention, filed a bill in the District Court, under section 4915 of the Revised Statutes (35 USCA § 63), in which he prayed that Walker be directed to defend the suit; that Joutras and Landers be decreed to be the true, original, and first inventors; and that the Commissioner of Patents be "authorized" to issue a patent to it. Walker filed an answer and counterclaim wherein he prayed that he be decreed to be the sole and original inventor and that Joutras, Landers, et al. be directed to assign to him all their right, title, and interest in and to their application and that letters patent be issued to him for the invention.

The case was referred by the court to a special master to take the testimony and report his findings of fact and conclusion of law to the court. The master found that Walker was the first and original inventor, and that the invention "was not mechanically developed or perfected or proved efficient or practical for the purposes for which it was intended until the year 1926," which was contrary to the finding of the interference examiner and the law examiner. He recommended that letters patent should issue to Walker for the invention.

Exceptions were filed to the special master's report, but the learned trial judge dismissed them and entered a decree to the effect that Walker was the first and original inventor; that the invention was not in public use two years before he filed his application on October 25, 1927, and ordered the plaintiff to assign all its right, title, and interest in and to the patent application to Walker. He further directed the Commissioner of Patents to issue a patent to Walker, and the plaintiff to pay to Walker his expenses incurred of $18,371. From this decree the plaintiff appealed.

 No question has been raised by any one as to the patentability of the invention provided the application was made in time. The Commissioner of Patents did not refuse a patent to Walker because of the lack of merit or patentability of the invention, but solely on the ground that he did not make his application within two years after the invention had been reduced to public use. If Joutras and Landers were the original and sole inventors, the plaintiff as owner of their application is entitled to a patent; but if Walker was the first and original inventor, he is entitled to a patent if he made his application within two years after it was reduced to public use.

The court specifically found that beginning with December 18, 1919, and continuing until the beginning of the year 1926, Walker, Joutras, and Landers conferred and worked together for the development and perfection of the invention. During this period, from 1919 to 1926, the court found that many units embodying the emergency lighting equipment of the invention were installed in many places in Pennsylvania, but in no instance did the units develop that perfection which was necessary to make the same a firm, stable, and lasting piece of machinery for furnishing electric light in buildings of various kinds and uses, where people were congregated,

to take the place of the regular electric lighting and current. The special master and court expressly found that:

"37. The application for letters patent by said John H. Walker, the defendant, was made and filed within two years from the date when said invention, the invention in question, was developed, tested and made into a useful, practical and operative device as an emergency lighting device to take the place of the regular lighting device in any building where the same failed to operate. The said development and reduction to practice did not take place until after the beginning of the year 1926.

"38. The invention in question prior to the first of the year 1926 was never sold nor put on sale to the general public or to any other.

"39. The invention in question was never abandoned either actually or constructively, by the defendant, John H. Walker, or by any one else with his knowledge and consent, nor openly by him or any one else.

"40. The invention in question never became, prior to the year 1926, nor since, subject to public use, or sale made of the invention or any units embodying the invention, by John H. Walker, the defendant, Franklin C. Joutras or James Landers, or any of their associates, or the Central Station Equipment Company or the Utilities Service, Inc., plaintiff in this suit.

"41. The invention in question is the sole invention of John H. Walker, the defendant, and the said John H. Walker, the defendant, is the original first inventor of said invention."

Joutras, who would naturally not be too friendly to Walker, came up from Miami for the trial, and testified as follows:

"While I felt that the decision of the patent office awarding this patent to John H. Walker may not have met with my approval, I would naturally abide by their decision, but when it comes to the point of declaring this item one of public use the decision is absolutely unfair in my opinion, and I decided regardless of the situation generally to come north and offer what little service I could to prevent this injustice."

"Q. Did you and your associate in the development of the device in question, ever at any time prior to the beginning of the year 1926, succeed in developing or improving the device in question to a point

of efficiency where it was useful for the purpose for which it was intended, or such as would be finally approved by the Department of Labor and Industry of the State of Pennsylvania? A. No, sir, we did not.

"Q. You did, under the certificate of approval which has been marked defendant's exhibit No. 2, place or install a number of the units or devices in various places in the State of Pennsylvania, did you not? A. Yes, sir, we did.

"Q. Were any of those devices so placed, as referred to in the last question and answer ever sold or placed or installed as positively approved equipment in any place, or were they only placed for the purpose of experimentation, development and improvement? A. They were only placed for experimentation, development and improvement and so that the Department of Labor and Industry could watch and check their operation.

"Q. Prior to the year 1926, I understand you had entire control and supervision of placing and installation of the device in question, is that correct? A. That is correct.

"Q. Did either you or the Central Station Equipment Company or the Utilities Service, Inc., ever sell to anybody one of the devices in question, prior to the year 1926? A. I did not and we did not, and by 'we' I mean the Central Station Equipment Company and Utilities Service, Inc.

"Q. Is it or is it not true that every device, that is the hydroelectric emergency lighting device which we are discussing, which were installed prior to the beginning of the year 1926, was installed only for the purpose of experimentation, testing and development of said device, and that the Department of Labor and Industry of the State of Pennsylvania, and each of the respective owners and managers of the places in which said device was installed, and the respective contractors who installed such devices, were fully informed and knew and agreed that such devices were installed only for the purpose of experimentation, testing and development, with the understanding that it was the desire of all the parties concerned and mentioned and referred to in this question that such device should be perfected for the purpose for which it was intended, if possible? A. That is absolutely true."

The evidence rather clearly shows that the invention was not perfected and reduced to public use until in the year 1926. Many tests had been made under changing conditions and at various places before the inventor could truthfully say with any degree of certainty that the invention was useful or that the device by which it was carried out was practical. While several devices were constructed, set up, and tried out in a few places and establishments in Pennsylvania under the supervision of Joutras, none were paid for, and they were purely for experiment and development of the patent. Under such facts the cases of which Elizabeth v. American Nicholson Pavement Company, 97 U. S. 126, 133–137, 24 L. Ed. 1000, is typical, hold that such experimental use in order to perfect the invention does not constitute reduction to public use within the meaning of the statute.

The plaintiff says that there is "no jurisdiction of counterclaim alleging fraud under section 4915, R. S.," and if the patent is denied to it, the court did not have jurisdiction to award it to Walker.

This section (35 USCA § 63) provides: "Whenever a patent on application is refused, either by the Commissioner of Patents or by the Court of Appeals of the District of Columbia upon appeal from the commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law."

Appellant says that jurisdiction under this section is limited to adjudging that the plaintiff who is "the applicant" is entitled "to receive a patent for his invention." The statute so provides and, plaintiff says, the court cannot go outside the statute, which is the foundation of the action, to assume to itself powers and authority not found in the statute. In support of its contention plaintiff quotes the following from Illingworth v. Atha (C. C. N. J. 1890) 42 F. 141, 144: "This is purely a statutory proceeding, and the court cannot go outside the statute which is the founda-

tion of the action to assume to itself powers not found in the purview of the act. The section under consideration has but a single object,—to provide a way by which an unsuccessful applicant for letters patent, notwithstanding the rejection of his claim by the commissioner of patents, may obtain them through an adjudication, in favor of his right thereto, by a court of equity having cognizance of the subject-matter; and, as the object of the section is single, so is the power of the court plainly limited under it to the accomplishment of that object."

The case of Illingworth v. Atha, supra, was decided in 1890, long before the Supreme Court promulgated Equity Rule 30 (28 USCA following section 723), on November 4, 1912, and under section 4915 of the Revised Statutes, standing alone, as it did in 1890, Walker might not be entitled to the relief which he is seeking. The second paragraph of rule 30 provides that: "The answer must state in short and simple form any counterclaim arising out of the transaction which is the subject-matter of the suit, and may, without cross-bill, set up any set-off or counterclaim against the plaintiff which might be the subject of an independent suit in equity against him, and such set-off or counterclaim, so set up, shall have the same effect as a cross-suit, so as to enable the court to pronounce a final decree in the same suit on both the original and the cross-claims."

This rule has been the subject of two lines of conflicting decisions. The one line holds that the rule authorizes the defendant to set up in his answer any counterclaim arising out of the transaction, which is the subject-matter of the suit and which, prior to the adoption of the rule, might have been set up in a cross-bill. The other line holds that the defendant in his answer *must* set up such a counterclaim. He has no option in the matter. But he *may*, though he is not required to, set up *any* set-off or counterclaim against the plaintiff which might be the subject of an independent suit in equity against him, even though such cause of action is wholly unconnected with the subject of the plaintiff's suit. The following cases are typical of the second line of decisions: Electric Boat Company v. Lake Torpedo Boat Company (D. C. N. J. 1914) 215 F. 377; Paramount Hosiery Form Drying Company v. Walter Snyder Co. (D. C. Pa. 1917) 244 F. 192; Champion Spark Plug Company v. Champion Ignition Company (D. C. Mich. 1917) 247 F. 200; Victor Talking Machine Co. v. Brunswick-Balke-Collender Co. (D. C. Del. 1922) 279 F. 758.

Equity Rule 30 was taken from or suggested by Order XIX, Rule 3, of the English Supreme Court of Judicature. It has always been held by the English courts construing that order that independent causes of action in equity wholly unconnected with the claim of the plaintiff may be counterclaimed.

It was the purpose of the new equity rules to simplify equity pleading and practice by limiting the pleadings to a statement of ultimate facts without evidence and by uniting in one action as many issues as could conveniently be disposed of therein. That the cases cited above declare the correct rule was settled by the Supreme Court in the case of American Mills Company v. American Surety Company of New York, 260 U. S. 360, 43 S. Ct. 149, 151, 67 L. Ed. 306. In that case the surety company filed a suit in a state court in New York against the mills company for the purpose of canceling and enjoining the enforcement of a certain guaranty made by the surety company upon which the mills company had sued it in the state courts in Georgia and Illinois on the ground that the guaranty of the surety company had been secured by fraud. Upon final hearing the court entered a decree canceling the guaranty. This was affirmed by the Circuit Court of Appeals, 273 F. 67, and on appeal the Supreme Court affirmed the decree.

As to the right to file the counterclaim the Supreme Court said, in construing Rule 30: "Petitioner's construction of rule No. 30 would deny the successful defendant in the equity action this right. Petitioner seeks to avoid the dilemma by the suggestion that the rule would be satisfied by merely pleading the action at law without proving it, but this would be futile. The counterclaim referred to in the first part of the paragraph must therefore be an equitable counterclaim, one which like the set-off or counterclaim referred to in the next clause could be made the subject of an independent bill in equity. The counterclaim and the set-off and counterclaim in the two clauses are in pari materia except that the first grows out of the subject-matter of the bill and the other does not. That which grows out of the subject-matter of

the bill must be set up in the interest of an end of litigation. That which does not may be set up if the defendant wishes in one proceeding in equity quickly to settle all equitable issues capable of trial between them in such a proceeding, even though they are not related. Buffalo Specialty Co. v. Vancleef (D. C.) 217 F. 91. The formality of cross-bills is not required, and the rule goes as far as possible to facilitate the prompt disposition of equitable controversies between the same litigants. The rule should be liberally construed to carry out its evident purpose of shortening litigation, but the limitation of counterclaims to those which are equitable is imperative."

In the case at bar the issue in a broad sense was: Who was the true, original, and first inventor of the subject-matter of the interference and in consequence entitled to the patent? Did that issue arise out of the transaction which was the subject-matter of the suit?

The plaintiff contended that Joutras and Landers were; Walker contended that he was. In the original bill plaintiff as assignee of the application for the patent prayed that the Commissioner of Patents be authorized to issue the patent to it. In the answer and counterclaim Walker alleged that Joutras and Landers were not the first, true, and original inventors but that he was, and prayed that the Commissioner of Patents be authorized to issue the patent to him. "Transaction" is a word of flexible meaning and may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. Moore v. New York Cotton Exchange, 270 U. S. 593, 610, 46 S. Ct. 367, 70 L. Ed. 750, 45 A. L. R. 1370. The issue, in our judgment, in this case arose out of the transaction which was the subject-matter of the suit. But if it did not, it was an issue which might be the subject of an independent suit in equity against the plaintiff in which the court could enter a decree authorizing the Commissioner of Patents to grant a patent to Walker.

Consequently Walker properly set up this issue in the counterclaim.

In his counterclaim Walker alleged that he "had suffered great loss and damages by reason of the great delay in withholding the issue by the United States Patent Office of Letters Patent covering his said improvement and invention," and prayed that the plaintiff be ordered and directed to pay to him the sum or amount of money which he had been compelled to pay and expend in protecting his rights and ownership of the invention by reason of the conspiracy and fraud by the plaintiff and its assignees. The special master found as a fact that Joseph L. Dunn for and on account of Walker, and upon the agreement of Walker to reimburse him, paid out in the defense of the interference proceedings and the expenses thereof the sum of $75,000, but that he was only able to produce checks and receipts for the sum of $18,371. He accordingly found that Walker was "damaged financially to the extent of $18,371." The learned trial judge entered judgment against the plaintiff for that amount, $18,-371.

The new equity rules did not change in any respect the line between law and equity as made by the federal statutes and the practice and decisions of the courts when the rules were promulgated. While rule 30 should be liberally construed to carry out its evident purpose of shortening litigation, "the limitation of counterclaims to those which are equitable is imperative." American Mills Company v. American Surety Company, 260 U. S. 360, 364, 365, 43 S. Ct. 149, 151, 67 L. Ed. 306.

It follows that the decree of the District Court is affirmed in so far as it authorizes the Commissioner of Patents to issue the patent for the invention in question to Walker, and the affirmance carries with it the ordinary taxable costs usual to the prevailing party in suits in equity. But in so far as the decree awards "damages" which are properly the subject of a suit at law, the decree is reversed, and the counterclaim to that extent dismissed.