**William R. WATTS, Plaintiff,**

v.

**The UNIVERSITY OF DELAWARE, Defendant.**

Civ. A. No. 77–343.

United States District Court, D. Delaware.

May 25, 1979.

As Amended June 27, 1979.

**1274**

E. Leigh Hunt, Wilmington, Del., for plaintiff.

E. Alan Uebler of Mortenson & Uebler, Wilmington, Del., for defendant.

## OPINION

LATCHUM, Chief Judge.

William R. Watts (the "plaintiff") is the owner of two United States patents that describe and claim a chair frame. He has filed a two-count complaint against the University of Delaware (the "University") seeking injunctive relief and damages.[1] Count I alleges that the University has infringed both of the plaintiff's patents. Count II sounds in unfair competition. The plaintiff alleges that, before the patent issued, he revealed his secret design for a chair frame to the University in confidence and that the University misappropriated and exploited his design by disclosing it and by unfairly obtaining bids and purchasing chairs of that design from others than the plaintiff.[2] A jury trial has been demanded.[3]

The University filed an answer in which it asserted, among other things, an affirmative defense of fraud on the United States Patent and Trademark Office ("Patent Office"), two counterclaims for declaratory judgments that the plaintiff's patents are invalid, unenforceable and not infringed and a request for costs and attorney's fees.

---

1. Docket Item 1. The plaintiff's second patent issued after the complaint was filed. The claims based on the second patent are set forth in Docket Item 39.

2. This Court has jurisdiction over both counts of the complaint under 28 U.S.C. § 1338. In a Memorandum Opinion dated March 14, 1978 (Docket Item 16), the Court denied defendant's motion to dismiss Count II for lack of subject matter jurisdiction, holding that the requirements for exercising pendent jurisdiction under 28 U.S.C. § 1338(b) are satisfied here.

3. Docket Item 1.

(Docket Items 20 and 28). The University challenges the validity of the patents on the ground, *inter alia,* that a statutory bar exists because the claimed chair frame was in public use or on sale in this country more than one year prior to the date the patent applications were filed.

This case is presently before the Court on the parties' cross motions for partial summary judgment. The University moved for summary judgment on the following issues: (1) whether the plaintiff's patents are invalid due to a prior public use or sale of the claimed invention; (2) whether there was an oral agreement of confidentiality binding on the University; (3) assuming that the University prevails on the first two issues, whether the claim of unfair competition should be dismissed for lack of subject matter jurisdiction; and (4) whether the University is entitled to an award of its reasonable attorney's fees pursuant to 35 U.S.C. § 285. (Docket Item 36). In its cross motion, the plaintiff seeks partial summary judgment on all issues relating to liability. (Docket Item 40). This Opinion addresses the issues raised by the pending motions.

## BACKGROUND

The plaintiff is the owner of two patents: (1) design patent Des 243,427, which is entitled "Frame for a Seat" and was issued on February 22, 1977,[4] and (2) utility patent U.S. 4,074,919, which is entitled "Chair Frame Furniture Unit" and was issued on February 21, 1978.[5] The descriptions and claims of the two patents relate to the same chair frame.

The University contends that both patents are invalid under 35 U.S.C. § 102(b), which provides in pertinent part:

A person shall be entitled to a patent unless—

. . . . .

(b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

The applications for both the patents in suit were filed on August 27, 1975.[6] The critical date therefore is August 27, 1974.

The plaintiff's affidavit[7] alleges the following facts, which for present purposes are undisputed. The plaintiff is a furniture upholsterer and designer by trade. For a number of years prior to 1974 he did upholstery repair work for the University. In or around February 1974 the plaintiff set out to design a chair unit that would be more durable and easier to repair than the furniture then being used by the University. During the first week of April 1974 the plaintiff completed his drawings for the basic chair unit and delivered them to a furniture frame manufacturer in Philadelphia, M. Halpern & Sons, Inc. ("Halpern"), so that a prototype could be made. Halpern made the frame and, on April 29, 1974, the plaintiff inspected it and authorized several minor changes. On May 30, 1974, the plaintiff's wife picked up the chair unit as modified. Halpern retained a second frame of the same design in storage for future use as either a pattern for production or a basis for modifications.

Between February and early June of 1974 the plaintiff had a few meetings with employees of the University at which he discussed his idea for a new chair frame. Although factual disputes exist concerning what transpired at the various meetings, the following chronology is essentially undisputed.

Sometime in February 1974 the plaintiff mentioned his efforts to design a more durable chair unit to N. Wayne Hurst, an employee in the University's Housing Division.[8] In mid-May 1974 Hurst and Stephen S. Showers, who was the Associate Director

---

4. Docket Item 1, exh.

5. Docket Item 39, exh.

6. Docket Item 49, par. 2.

7. Docket Item 49.

8. Watts Affid. (Docket Item 49), par. 8; Hurst Dep. (Docket Item 47), p. 74.

of Housing, visited the plaintiff at his upholstery shop and discussed generally with him his work in designing a new chair unit.[9] In early June 1974 the plaintiff or one of his employees delivered the unupholstered prototype chair frame to Richard Blakeman, the University's Director of Purchasing, for his inspection. The chair was delivered to Blakeman's office and picked up later the same day.[10] The plaintiff never explicitly offered to sell the chair to Blakeman, and Blakeman did not offer to buy it.[11] Around the same time, Showers asked the plaintiff if he wanted to put his chair in a lounge being used by students in the College Try Program for a two-week period in order to test it. In previous years students in the College Try Program had subjected the lounge furniture to very hard use.[12]

The plaintiff agreed to the test and, after upholstering the chair frame at his own expense, delivered it to the dormitory involved on or about June 24, 1974.[13] Both the plaintiff and Showers inspected the chair at least once during the time it was in the lounge.[14] The plaintiff also authorized Showers to have drawings made of the chair so that the University would have a record of it in the event of theft.[15] The plaintiff picked up the chair sometime in July 1974.[16]

The chair frame described and claimed in the patents in suit is exactly the same as the chair frame used in the College Try Program.[17] No changes were made in the design as a result of the test.

In November 1974 the University requested bids on furniture of the type designed by the plaintiff. The plaintiff's bid proved unsuccessful. Thereafter, he actively pursued his rights to a patent, submitting applications for design and utility patents on August 27, 1975.

According to the plaintiff, the University spent over $150,000 to purchase furniture of the type he designed between 1975 and the end of 1977. (Docket Item 48, exh. E–89). The plaintiff further alleges that the University's employee Showers has obtained a copyright on drawings of the plaintiff's chair frame design and licensed a company to make and sell the furniture at a substantial royalty to the University. (Docket Item 48, exhs. E–56, 66B, 66C and 86). The Court now turns to the parties' contentions.

## I. *Public Use*

The University contends that the use of the chair frame in its dormitory lounge in June 1974 was a public use of the plaintiff's invention more than one year before the patent application date, and therefore constitutes a statutory bar to patentability. The plaintiff advances two grounds to avoid the statutory bar. First, he appears to argue that the use was not public, because the dormitory lounge was not open to the general public [18] and the chair frame itself, as opposed to the upholstered chair unit, could not be seen by those who used the lounge. Second, the plaintiff argues that the use of the chair frame in June 1974 represented an experimental use and as such falls outside the proscription of § 102(b).

 The plaintiff's first argument lacks merit. The courts have construed the

9. Watts Affid., par. 13.

10. *Id.* par. 16; Blakeman Dep. (Docket Item 47), pp. 101–103. The plaintiff alleges that Blakeman asked to see the chair frame, but Blakeman denied that allegation at his deposition.

11. Watts Affid., par. 14; Blakeman Dep., pp. 118–19.

12. Watts Affid., par. 17; Showers Dep., p. 6.

13. Watts Affid., par. 18.

14. Watts Affid., par. 20; Showers Dep., p. 26.

15. Watts Affid., par. 19; Showers Dep., p. 56.

16. Watts Affid., par. 21.

17. Watts Dep., p. 40.

18. The Residence Halls Handbook distributed by the University during the time period relevant to this suit limited access to the residence halls to residents, University officials and guests "who have a specific, legitimate reason for being in the building." Docket Item 48, exh. E–1B, 1C.

term "public use" in § 102(b) very broadly. A single use of an invention without restriction or limitation by even one person who is not an agent of the inventor is sufficient to constitute a public use. *Egbert v. Lippmann,* 104 U.S. (14 Otto) 333, 336, 26 L.Ed. 755 (1881). As the court stated in *Watson v. Allen,* 103 U.S.App.D.C. 5, 8, 254 F.2d 342, 345 (1958):

> [P]ublic use exists where the invention is used by, or exposed to, anyone other than the inventor or persons under an obligation of secrecy to the inventor.

Thus, use of a device under conditions of limited public access may still be a public use. *See Electric Storage Battery Co. v. Shimadzu,* 307 U.S. 5, 19, 59 S.Ct. 675, 83 L.Ed. 1071 (1939); *Marrese v. Richard's Medical Equipment, Inc.,* 504 F.2d 479, 482–83 (C.A.7, 1974); *Magnetics, Inc. v. Arnold Engineering Co.,* 438 F.2d 72, 74 (C.A.7, 1971). Since the students who used the dormitory lounge owed no duty of secrecy to the plaintiff, the fact that the general public did not have access to the lounge is immaterial. Likewise, the fact that an invention when used in its natural and intended way may be hidden from the public's eye provides no basis for concluding that a use of the invention is not public. *Egbert v. Lippmann, supra,* 104 U.S. at 336.

The public nature of the June 1974 use does not necessarily render the plaintiff's patents invalid, however. For despite the seemingly absolute wording of the statute, the courts have engrafted an exception onto § 102(b) by which a public use incidental to experiment will not bar patentability. The leading case is *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 24 L.Ed. 1000 (1877). It involved Nicholson's patent on a new and improved wooden pavement for roads. Nicholson had constructed a 75 foot length of his pavement at his own expense on a heavily traveled road-

way in Boston. The pavement was subjected to public use for six years before a patent application was filed. Nevertheless, the Supreme Court held that the use was not a public use within the meaning of § 102(b), because the plaintiff intended it to be an experiment to test the usefulness and durability of his invention. *Id.* at 134. The Court stated:

> The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a [public] use.

*Id.* The plaintiff in the case *sub judice* alleges that he agreed to let the University use the chair in the College Try Program in June 1974 in order to determine whether the chair unit could withstand heavy use and whether any changes were required to perfect it. Thus, he contends that the use falls within the experimental use exception to § 102(b).

 In support of his position the plaintiff has invoked 35 U.S.C. § 282, which provides:

> A patent shall be presumed valid. . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

It is well established, however, that the presumption of validity that stems from the issuance of a patent is weakened where the prior art or other information upon which a challenge to validity is based has never been presented to the patent examiner.[19] The record in this case indicates that neither the plaintiff nor his attorney brought the June 1974 use of the chair frame to the attention of the patent examiner.[20] Consequently, the effect of the presumption here is simply to impose upon the University the burden of proving by "clear and convincing

---

19. *See, e. g., Chemical Construction Corp. v. Jones & Laughlin Steel Corp.,* 311 F.2d 367, 371 n. 1 (C.A.3, 1962); *Scripto, Inc. v. Ferber Corp.,* 267 F.2d 308 (C.A.3), *cert. denied,* 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959); *Dole Refrigerating Co. v. Amerio Contact Plate Freezers, Inc.,* 265 F.2d 627, 629 (C.A.3, 1959); *Douglas*

*v. United States,* 510 F.2d 364, 369, 206 Ct.Cl. 96, *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 41 (1975).

20. Hunt Dep. (Docket Item 30), p. 19; *see* Watts Dep., exh. D–3, p. 10; Docket Item 37, exhs. C and D.

evidence" that the plaintiff's invention was in public use more than one year before the patent application date. *See* 2 Chisum, *supra*, § 6.02[8]. Based on the undisputed facts recited earlier, the Court finds that the University has met its burden.

■ To avoid the operation of the statutory bar of § 102(b), therefore, the plaintiff must prove that the June 1974 use of the chair frame was only an experimental use. For, as the Third Circuit held in *Paeco, Inc. v. Applied Moldings, Inc.,* 562 F.2d 870, 872 (C.A.3, 1977):

> Once the party asserting invalidity has convincingly proven the prior use or sale, . . . the burden shifts to the patentee to prove that any prior use, sale, or printed publication was for experimental, not commercial, purposes. *Azoplate Corp. v. Silverlith, Inc.,* 367 F.Supp. 711 (D.Del.), *aff'd,* 506 F.2d 1050 (C.A.3), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

Furthermore, the proof of an experimental use must be "full, unequivocal, and convincing." *Smith & Griggs Manufacturing Co. v. Sprague,* 123 U.S. 249, 264, 8 S.Ct. 122, 31 L.Ed. 141 (1887); *Wilkie v. Manhattan Rubber Manufacturing Co.,* 14 F.2d 811, 812 (C.A.3, 1926). In *Wilkie v. Manhattan, supra,* the Third Circuit held that there must be evidence of both the need for, and the fact of, experimentation to bring a prior public use within the experimental use exception. 14 F.2d at 813; *accord, Callahan v. Nesbitt,* 1 F.2d 75, 77 (C.A.3, 1924).

The University first contends that, as a matter of law, no experimentation was necessary on the plaintiff's invention after June 1, 1974, because a prototype of the chair frame claimed in the patents in suit was made before that date. A few cases

suggest that experimentation in the context of § 102(b) ends once a working prototype has been developed.[21] The prevailing view, however, is that experimentation may continue even after an invention has been developed to the point that it is capable of use. That is, an inventor may test his invention to determine its comparative utility or whether it is worth pursuing without triggering the one year grace period provided by § 102(b).[22]

Much of the confusion in the caselaw can be traced to inconsistent judicial definitions of "reduction to practice," a term of art in patent law, and divergent views concerning how that concept relates to experimental use for purposes of § 102(b).[23] In *In re Yarn Processing, supra,* the Fifth Circuit observed:

> In layman's terms, "reduction to practice" connotes the initial construction of a working model of a new invention. . . . As a legal term of art, however, "reduction to practice" includes not only this reduction to reality but also sufficient testing or experimentation to demonstrate that the device as it exists possesses sufficient utility to justify a patent, i. e., that the invention is suitable for its intended purpose. . . . *Mere construction of the device . . . does not reduce it to practice unless it is so simple that satisfactory operation is obvious. Gordon v. Hubbard,* 1965, 347 F.2d 1001, 52 C.C.P.A. 1598.

498 F.2d at 280 (emphasis supplied).

To this Court's knowledge the Third Circuit has not squarely addressed the issue of when the period of permissible experimentation ends. Moreover, in light of the Court's resolution of the question of experimental intent, it is unnecessary to decide

---

**21.** *See Smith & Griggs Mfg. Co. v. Sprague, supra,* 123 U.S. at 264, 266, 8 S.Ct. 122; *National Biscuit Co. v. Crown Baking,* 105 F.2d 422, 425 (C.A.1, 1939).

**22.** 2 Chisum, *supra* § 6.02[7](b). *See e. g., In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 278–85 (C.A.5), *cert. denied,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 70–71 (1971); *Aerovox Corp. v. Polymet Mfg. Corp.,*

67 F.2d 860, 862 (1933). A classic example is *City of Elizabeth, supra,* where the Supreme Court held a six year public use experimental, because it was intended to test the durability of a new type of pavement. 97 U.S. (7 Otto) at 135.

**23.** For an exhaustive discussion of the problem, see *In re Yarn Processing, supra,* 498 F.2d at 278–85.

the issue in this case. Two points deserve mention, however. First, even under the more liberal view of experimentation espoused in *In re Yarn Processing, supra,* the University's argument raises a question of fact: whether the plaintiff's chair frame was "so simple that satisfactory operation [was] obvious." Second, the relative simplicity of the invention and the obvious usefulness of the prototype as a chair heightens the importance of evidence demonstrating that the plaintiff's primary motive in permitting the June 1974 use was experimentation.

The latter point distinguishes this case from several cases cited by the plaintiff in which the courts found the experimental use exception applicable. For example, *Utilities Service, Inc. v. Walker,* 78 F.2d 18 (C.A.3, 1935), involved a patent on a device to furnish automatically emergency lighting in the event of an interruption in the regular supply of electric current. The inventor installed several different versions of the device in various places at his own expense. The Pennsylvania Department of Labor and Industry monitored the performance of some of those devices. 78 F.2d at 21–22. Noting the unique nature of the invention and the requirement that it function reliably in many different situations, the court found that extensive experimentation was necessary "before the inventor could truthfully say with any degree of certainty that the invention was useful or that the device by which it was carried out was practical." *Id.* The same observation could be made about the inventions involved in two other cases relied upon by the plaintiff. ·One dealt with a solar still which utilized the sun's energy to convert salt water to drinking water;[24] the other involved a complicated piece of machinery used in the textile industry.[25] In each of those cases the uses complained of preceded the completion of the invention and were part of the developmental process. In contrast, the plaintiff's chair frame was completely operational when it was placed in public use in June of 1974. Thus, any experimentation the plaintiff engaged in must have been aimed at testing the comparative utility of his invention or determining whether further refinement was needed. *See In re Yarn Processing, supra,* 498 F.2d at 285.

In *Paeco, Inc. v. Applied Moldings, Inc., supra,* 562 F.2d at 874, the Third Circuit stated that the "experimental use" doctrine

> allows an inventor a reasonable period of experimentation wherein he may perfect his ideas, provided that the inventor truly has utilized the public use or sale to that laudatory end, not as a competitive tool to exploit his invention and gain an advantage over others. *Koehring Co. v. Nat'l Automatic Tool Co.,* 362 F.2d 100, 103–04 (7th Cir. 1966).

Thus, the plaintiff must prove that his primary intent in permitting the chair frame to be used in the College Try Program was experimentation.

> It is not enough that he intends incidentally to test its value; he may not so reserve his rights; his primary purpose must be the test, though incidentally he may get what profit he can.

*Aerovox Corp. v. Polymet Manufacturing Corp.,* 67 F.2d 860, 862 (C.A.2, 1933).

The University seeks partial summary judgment on the public use issue on the ground that the plaintiff's primary intent was commercial exploitation, not experimentation. In disposing of the University's motion, the Court must take all the plaintiff's allegations as true and draw all inferences in his favor. *Scott v. Plante,* 532 F.2d 939, 945 (C.A.3, 1976). The Court also recognizes that because the experimental use issue turns on the patentee or inventor's intent, it generally is not well suited to disposition by summary judgment. *In re Yarn Processing, supra,* 498 F.2d at 288. The reason is that resolution of issues involving intent often depends upon the credibility of witnesses testifying as to their own states of mind. *Id.* This case is unusual, however, in that the plaintiff's own

---

24. *Ushakoff v. United States,* 327 F.2d 669, 164 Ct.Cl. 455 (1964).

25. *Progressive Engineering Inc. v. Machinecraft, Inc.,* 169 F.Supp. 291 (D.Mass.1959).

**1280**

testimony about his intent presents the most compelling evidence against a finding of experimental intent. The courts have granted summary judgment on experimental use in such circumstances. *See, e. g., Atlas v. Eastern Airlines, Inc.,* 311 F.2d 156 (C.A.1, 1962); *Roller Bearing Co. of America v. Bearing, Inc.,* 322 F.Supp. 703, 707–11 (E.D.Pa.1971).

■ At the outset, it is noteworthy that the purpose of the "public use or on sale" bar in § 102(b) is to prevent an inventor from extending the limited monopoly granted by a patent and to encourage prompt disclosure of new and useful information. *See Chromalloy American Corp. v. Alloy Surfaces Co.,* 339 F.Supp. 859, 865 (D.Del.1972).

■ The statute provides a one year "grace period" from the date of the first public use or sale of an invention within which an inventor or his assignee may file a patent application. The grace period affords the inventor time to perfect his invention and prepare a patent application. 2 Chisum, *supra,* § 6.02. The experimental use exception reflects a policy of allowing an inventor more time to test and perfect his invention and to assess its utility in operation, so long as his activities do not contravene the statutory objectives. In that respect, the courts have held that the term "experiment" for § 102(b) purposes does not include market testing or attempts to develop buyer demand for an invention. *See Paeco, Inc. v. Applied Moldings, Inc., supra,* 562 F.2d at 874–75; *Kalvar Corp. v. Xidex Corp.,* 556 F.2d 966 (C.A.9, 1977) (per curiam); *Smith & Davis Mfg. Co. v. Mellon,* 58 F. 705, 707 (C.A.8, 1893).

The undisputed facts in the instant case are that the plaintiff undertook to design a more durable and more easily repairable chair frame in February 1974 because he perceived a need for such furniture on the part of the University. (Docket Item 49, pars. 6, 7). Almost immediately thereafter the plaintiff brought his efforts to the attention of Mr. Hurst, an employee of the University. (*Id.,* par. 8). In May 1974 the plaintiff discussed his work with Hurst and his supervisor, Mr. Showers. Shortly after that the University's Director of Purchasing, Mr. Blakeman, asked to see the prototype the plaintiff had made and the plaintiff had it delivered to him for inspection. (*Id.,* pars. 14, 16). Finally, the plaintiff agreed to the use of his chair unit in the College Try Program in June 1974. (*Id.,* pars. 17, 18).

At his deposition the plaintiff explained his motive for showing the chair frame to employees of the University as follows:

Why, if they liked it and it went, I would have the job of making them, or subletting them.

(Watts Dep., p. 25). Concerning the use of the chair unit in the College Try Program, the plaintiff testified:

BY MR. MORTENSON [defendant's attorney]:

\* \* \* \* \* \*

Q What was the purpose of the trial basis?

A To see whether they would be interested in it if it upheld or withheld the abuse of the students.

Q If they were interested, were they free to go ahead and use it and adopt it?

A I didn't give them that right.

Q What was the purpose in giving them anything?

A Well, if you was in business, wouldn't you try to promote a product?

Q Why are you trying to promote the product?

A Well, we all eat, I guess, don't we?

Q In other words, you were looking for financial gain in your efforts there; were you not?

A That's what you are in business for, isn't it?

Q You were in business to offer this for sale to them; were you not?

A That's right.

Q If—

A If they approved of it.

(Watts Dep., pp. 26–27).

The quoted testimony clearly indicates that commercial exploitation was the plaintiff's dominant motive in June 1974. The

plaintiff, however, has submitted a later affidavit in which he denies using his invention publicly before August 27, 1974. Of course, that statement represents a legal conclusion and cannot overcome the evidence to the contrary already in the record. The affidavit contains two other carefully worded paragraphs that summarize the plaintiff's intent when he permitted the June 1974 use. Both paragraphs are set forth in full below:

22. My efforts with respect to the chair unit were other than charitable as upholstery work and furniture design is my livelihood. My purpose and motive in developing the chair unit of my invention, acceding to Mr. Blakeman's request to see the frame, and consenting to the U. of D's request to test the chair unit for two weeks in the College Try Program, was in the hope of ultimately making a profit from the venture. I hoped that the chair unit would withstand the abuse of the Try Program in the Russell Dorm, or, in the event that it did not withstand the abuse of the Program, I could modify the frame so as to prevent any particular part that did fail from failing in the future.

23. *It was my understanding from my course of dealing with the University that in the event the chair unit was satisfactory during the test in Russell, or if I could modify it to be satisfactory by alleviating any problems that developed during the test, I would provide the University's needs of the furniture in the future.* At no time prior to November of 1974 was I ever told that the matter had to go out to bid. In the past, most of my work for the University had been done without any bid process being followed. I had never been given any document stating any bidding policies nor did I have any reason to believe that the matter had to go out to bid in the event the University desired my chair units for their use or a modified design that may result from the test.

(Emphasis supplied). Neither of these statements is inconsistent with the plaintiff's deposition testimony. They clearly indicate that the plaintiff's purpose was to determine whether his product was acceptable to the University—his intended customer. He also believed that his previous activities had the effect of binding the University to buy similar furniture from him, if it approved the chair unit. In other words, the plaintiff kept the University apprised of his efforts and submitted his invention for a test in order to gain an advantage over his competitors. The idea of perfecting his invention was secondary; indeed, paragraph 23 of the affidavit indicates that the plaintiff thought that even if the chair proved unsatisfactory, the University would still be bound to buy from him if he could correct the defects that appeared. Hence, the Court concludes from the undisputed facts that the plaintiff's primary intent was to commercially exploit his invention; therefore the experimental use exception to the public use bar of § 102(b) is not applicable.

The objective evidence in this case is not inconsistent with the Court's findings. The plaintiff emphasizes that the University requested permission to use the chair unit in the College Try Program. He also states in his brief that the "progress of the chair was monitored regularly and the *University* was surprised at [its] durability." (Docket Item 48, p. 10) (emphasis supplied). These facts add nothing to the plaintiff's argument, for it is the intent of the patentee, not the user, that determines whether a use is experimental.[26] If anything, the plaintiff's focus on the University's reaction reinforces the conclusion that his primary intent was to obtain customer approval. The failure of the plaintiff to derive any profit from the

26. *See ADM Corp. v. Speedmaster Packaging Corp.,* 384 F.Supp. 1325, 1340 (D.N.J.1974), *aff'd on other grounds on invalidity,* 525 F.2d 662 (C.A.3, 1975); *Chromalloy American Corp. v. Alloy Surfaces Co., supra,* 339 F.Supp. at 871; *Philco Corp. v. Admiral Corp.,* 199 F.Supp. 797, 817 (D.Del.1961).

June 1974 use is circumstantial evidence of an experimental purpose, but it is not conclusive. *See Cataphote Corp. v. DeSoto Chemical Coatings, Inc.,* 235 F.Supp. 936, 939 (N.D.Cal.1964), *aff'd,* 356 F.2d 24, 27 (C.A.9), *cert. denied,* 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966). Similarly, the absence of any actual sales and the plaintiff's averment that he "checked with the [University] as to the progress of the chair unit" on two occasions [27] do not establish an experimental use. All the facts referred to constitute circumstantial evidence of intent. In this case, however, there is no need to rely on circumstantial evidence, because the plaintiff's own testimony clearly reveals his intent.

The direct evidence of intent also distinguishes this case from each of the cases relied upon by the plaintiff. Significant similarities do exist, however, between this case and *Interlego, A. G. v. F. A. O. Schwartz, Inc.,* 187 U.S.P.Q. 580, 584 (N.D. Ga.1975). There the plaintiff sued for infringement of a patent involving toy building block sets and the defendant raised the public use bar. The plaintiff had exported several sets of blocks to an importer in the United States, who, before the critical date, displayed the blocks to the defendant in order to determine their potential marketability. 187 U.S.P.Q. at 582. The importer could not offer the blocks for sale and did, in fact, return them to the plaintiff. *Id.* The plaintiff asserted the experimental use exception, but the court granted summary judgment for defendant. It held that the blocks were not supplied for the purpose of testing or experimentation for improve-

ment, but for the purpose of commercial exploitation. *Id.* at 584.[27a]

This Court finds additional support for its conclusion in several cases dealing with the related problem of determining whether a sale or offer of sale by sample amounts to placing an invention "on sale" for purposes of § 102(b). In such situations, the patentees often invoke the experimental use exception, thereby raising questions of intent like the one posed here. The courts have refused to apply the exception where the use of the later patented invention was for the competitive purpose of promoting a product or soliciting purchase orders, rather than advice. *See ADM Corp. v. Speedmaster Packaging Corp., supra,* 384 F.Supp. at 1340; *Roller Bearing Co. of America v. Bearing, Inc.,* 322 F.Supp. 703, 707–08 (E.D. Pa.1971); *J. L. Clark Manufacturing Co. v. American Can Co.,* 256 F.Supp. 719, 734–35 (D.N.J.1966).[28] The *Roller Bearing Co.* case is particularly instructive. The plaintiff in that case invented a roller bearing and delivered twenty of them free of charge to one of its principal customers, HYDRECO, "which had been actively seeking a roller bearing of longer life for use in heavy-duty pumps." 322 F.Supp. at 707. The customer wanted to test the bearing before converting to its use. The plaintiff also asserted an experimental intent. *Id.* The court rejected that argument and granted summary judgment for the defendant on the basis of evidence that bears a striking resemblance to the testimony of the plaintiff in this case. The Court held:

> evidence showed that prior to the purportedly experimental use the patentee had been advised that its toy blocks could not be successfully marketed in the United States and that, after the experimental use, the invention had, in fact, been modified. *Id.* at 134. Finally, there was no direct evidence of intent in *Interlego* comparable to the plaintiff's testimony in this action.

**27.** Docket Item 49, par. 20.

**27a.** On a motion for reconsideration in the *Interlego, A. G. v. F. A. O. Schwartz, Inc.* case, the court vacated its order granting summary judgment based on factual materials that had not been adequately brought to its attention originally and on amplified legal arguments. 191 U.S.P.Q. 129 (N.D.Ga.1976). The decision on reconsideration in *Interlego,* however, does not warrant a different conclusion in this case. The principles expressed in the opinion on reconsideration are entirely consistent with those applied here. *See id.* at 132–34. More importantly, the newly emphasized evidence in the *Interlego* case makes it distinguishable. That

**28.** Cf. *Strong v. General Electric Co.,* 434 F.2d 1042, 1046–47 (C.A.5, 1970) (summary judgment granted declaring patent invalid under § 102(b); no contention of experimental use).

It is clear, however, from various documents submitted by the defendants, that the principal intent of R.B.C. [the plaintiff] was not merely to obtain additional test results, but to convince HYDRECO of the reliability of the SJ–74197 [roller bearing]. It was anticipated that the test results, if favorable, would culminate in further sales. This rather conclusively appeared in a memorandum from R.B.C.'s sales representative handling the HYDRECO account to the R.B.C. Sales Department. . . . In a deposition, Mr. Trainer [the President of R.B.C.] indicated that on March 30, 1950, he visited HYDRECO and delivered some SJ–74197 samples:

> I would say that that was the main purpose, to deliver the samples and to use our selling efforts to interest them in it, because at that time we were competing with a Stallman [full-complement] bearing.
>
> Q. And your efforts to interest HYDRECO were for use in their equipment?
>
> A. Yes, sir. In their pumps. . . .

The evidence of the HYDRECO transactions rather comprehensively substantiates the defendant's assertion that the efforts of R.B.C. can only be characterized as sales overtures. . . .

There is little doubt that R.B.C. was *additionally* interested in the results of the initial HYDRECO testing. However, the mere delivery of a product to a prospective customer with full knowledge that the product will be subjected to acceptance testing does not in itself require application of the City of Elizabeth exception. In *United States Chemical Corp. v. Plastic Glass Corp.*, 142 F.Supp. 840 (D.N.J.1956) [, aff'd, 243 F.2d 892 (C.A.3, 1957)] the court observed, at page 844:

> But if the use is primarily for the purpose of profit, with the experimenta-

tion being only incidental, for a period more than one year prior to the application for a patent, it comes within the prohibition of the statute.

As in *Plastic Glass*, there has been no indication by the plaintiff that its motivation in forwarding the initial twenty bearings to HYDRECO was *primarily* for the purpose of continuing its program of experimentation. Nor has there been any indication or assertion by the plaintiff that it was placing any limitation upon the use by HYDRECO of the twenty bearings. . . .

\* \* \* \* \* \*

The one transaction involving twenty bearings SJ–74197 would alone be sufficient to invalidate the patent.

322 F.Supp. at 707–08 (footnote omitted) (emphasis in original).

■ In summary, the Court finds that the chair frame claimed in the patents in suit was in public use more than one year before the patent application date, August 27, 1975, and that the use was not primarily for experimental purposes. Accordingly, the Court will grant the defendant's motion for summary judgment declaring design patent Des 243,427 and utility patent U.S. 4,074,919 invalid by virtue of the public use bar of § 102(b).[29]

## II. The Unfair Competition Claim

Count II of the complaint alleges that, before the patents in suit issued, the plaintiff disclosed his invention to defendant's personnel "confidentially with the oral understanding that plaintiff would provide chair frames" to the University, if it decided to purchase chairs of that type. The complaint further avers that the defendant "breached this confidentiality agreement" by advertising for bids on the plaintiff's chair unit, thereby making the design public, and by accepting the bid of another

---

29. In view of the finding of invalidity based on the public use bar, the Court need not consider the other ground of invalidity advanced in the University's motion for summary judgment; namely, that the chair frame was "on sale" in this country prior to the critical date. Like-

wise, the finding of invalidity with respect to the patents in suit requires that the plaintiff's motion for partial summary judgment on liability on his patent infringement claims also be denied.

vendor. The parties have filed cross motions for summary judgment on Count II.

In support of its motion, the University contends that no agreement of confidentiality ever existed. Each of the three University employees who dealt with the plaintiff denied the existence of such an agreement.[30] In addition, the University cites the absence of any documentary evidence of an agreement and the plaintiff's inability to recall the terms of the agreement or the details of its making. Virtually the only thing about the alleged agreement the plaintiff could remember at his deposition was that it was made sometime after June of 1974. (Watts Dep., pp. 56–59). The defendant argues that this fact also refutes the existence of a confidentiality agreement because it means that the agreement was made after the chair frame had been in public use in the College Try Program.

After carefully reviewing the record, the Court concludes that the defendant's motion for summary judgment on the breach of confidence claim must be denied. As stated in an earlier opinion in this case, the gist of Count II is a claim of unfair competition based on the defendant's alleged misappropriation and exploitation of a secret design revealed to it in confidence by the plaintiff.[31] To make out a claim for misappropriation of a trade secret, the plaintiff must prove, *inter alia*, that he communicated the secret to the defendant while the defendant was in a position of trust and confidence. *See Smith v. Dravo Corp.*, 203 F.2d 369 (C.A.7, 1953).

> The underlying theory of the cases is that under a particular set of circumstances a relationship of confidence may arise by operation of law, even though there is no express agreement that the matters divulged will be held in confidence.

*International Industries, Inc. v. Warren Petroleum Corp.*, 99 F.Supp. 907, 914 (D.Del. 1951) (footnote omitted), *aff'd* 248 F.2d 696 (C.A.3, 1957).

Viewed in the light most favorable to the plaintiff, the record indicates that he intended to keep his invention a secret, that he agreed to put an upholstered chair in one of the University's dormitories at its request, that the design of the chair frame could not be determined without at least partially dismantling the chair, and finally that the plaintiff assisted the defendant's personnel in making a drawing of the chair frame upon their representation that the drawing was needed as a record in case of fire or theft. These allegations, if true, would support an inference that a confidential relationship existed independent of any express agreement of confidentiality.[32]

---

**30.** Blakeman Dep., p. 116; Showers Dep., pp. 65–66; Hurst Dep., p. 99.

**31.** Docket Item 16. Granting summary judgment in the defendant's favor on the patent infringement claims does not automatically divest the Court of jurisdiction over the pendent unfair competition claims under 28 U.S.C. § 1338(b). *Sunbeam Lighting Co. v. Pacific Associated Lighting Inc.*, 328 F.2d 300, 303 (C.A.9, 1964); *see O'Brien v. Westinghouse Electric Corp.*, 293 F.2d 1, 11–12 (C.A.3, 1961). As in the normal pendent jurisdiction context, the Court has discretion to decline to hear the claims based on considerations of "judicial economy, convenience and fairness to the litigants." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). In this case, much of the discovery relevant to the plaintiff's unfair competition claims had been completed and the Court is familiar with many of the material facts. Consequently, disposition of the unfair competition claim in federal court appears more likely to conserve judicial resources and save expense to the parties than would sending the non-patent claims to state court. More importantly, it is likely that a suit in state court based on the unfair competition claims would be barred by the applicable three-year statute of limitations. 10 *Del.C.* § 8106. For these reasons the Court has decided to retain jurisdiction over the unfair competition claims. *See Telechron, Inc. v. Parissi*, 197 F.2d 757, 762–63 (C.A.2, 1952); *Blake v. Town of Delaware City*, 441 F.Supp. 1189, 1205 (D.Del.1977).

**32.** The alleged public use of the chair in June 1974 does not necessarily negate the existence of a confidential relationship. The plaintiff alleges that the design of the chair frame could not be determined from viewing the upholstered chair. He also alleges that the University obtained his assistance in making the drawings of the chair unit that were later used in the bid solicitation through misrepresentation. In misappropriation of trade secret cases, some courts, at least, have held that the proper in-

Therefore, defendant's motion for summary judgment on the breach of confidence claim in Count II must be denied.

Since the University has controverted many of the plaintiff's allegations concerning the existence of a confidential relationship, the Court also must deny the plaintiff's motion for partial summary judgment on liability under Count II.

### III. *Attorney's Fees*

Lastly, the University has moved for summary judgment on its request for an award of its reasonable attorney's fees under 35 U.S.C. § 285. Section 285 provides:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party.

 Whether attorneys fees should be awarded in a particular case is left to the sound discretion of the trial judge. *ADM Corp. v. Speedmaster Packaging Corp.*, 525 F.2d 662, 664 (C.A.3, 1975). The courts do not grant such awards as a matter of course, however; generally they insist that the losing party be shown to have engaged in some form of misconduct.[33] Securing a patent through fraud on the Patent Office and maintaining a patent interference action in bad faith are two commonly recognized grounds for finding a case "exceptional" within § 285. *See W. L. Gore & Associates, Inc. v. Oak Materials Group, Inc.*, 424 F.Supp. 700, 704 (D.Del.1976); *Chromalloy American Corp. v. Alloy Surfaces Co.*, 353 F.Supp. 429, 431 (D.Del.1973).

> Conduct short of fraud, but in excess of simple negligence may also be an adequate foundation for an award of fees, if the prevailing party establishes a calculated recklessness about the truth or gross lack of diligence on the part of the losing party. *Monolith Portland Midwest*

quiry is not whether the secret *could have* been obtained through inspection, but rather how it was obtained in fact. *See Smith v. Dravo Corp., supra*, 203 F.2d at 374, citing *Pressed Steel Car Co. v. Standard Steel Car Co.*, 210 Pa. 464, 60 A. 4, 7 (1904). Since the parties did not brief this issue, the Court will assume for purposes of defendant's motion that the principle stated above applies to this case.

*Co. v. Kaiser Aluminum & C. Corp.*, [407 F.2d 288, 294 (C.A.9, 1969)]; *L. F. Strassheim Co. v. Gold Medal Folding Furniture Co.*, 477 F.2d 818 (7th Cir. 1973).

*W. L. Gore & Associates, Inc., supra*, 424 F.Supp. at 704.

 The record in this case does not support a finding of fraud on the Patent Office. The only facts the University advances in support of its motion are the failure of both the plaintiff and his attorney to apprise the patent examiner of the June 1974 use of the chair frame and two oaths submitted to the Patent Office by the plaintiff, in which he denied knowledge of any public use or sale of the chair frame prior to August 27, 1974. However, any inference these facts might raise of a conscious intent to defraud or a reckless disregard for the duty of frankness is rebutted by other evidence submitted by the plaintiff. In his affidavit the plaintiff stated that he informed his attorney about "all the details relating to the development of the chair unit, including the testing in the [College] Try Program." (Docket Item 49, par. 26). He also stated that he believed that the use of the chair in that program "was highly restricted as to persons" and did not inform the typical observer of the elements of his invention. (*Id.*, par. 30). In addition, the plaintiff's attorney testified at his deposition that when he was informed about the use of a chair unit in the College Try Program, he gave the plaintiff his opinion that the use "was strictly experimental as far as patent law or legal significance" was concerned. (Hunt Dep., pp. 8–9). In light of the difficult nature of the question whether the June 1974 use was experimental within the meaning of 35 U.S.C. § 102(b), the Court finds the plaintiff's failure to disclose the use an insufficient basis for a finding of fraud.

**33.** *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357, 1380 (E.D.Pa.1972), aff'd, 487 F.2d 1395 (C.A.3, 1973); *see Chemical Construction Corp. v. Jones & Laughlin Steel Corp.*, 311 F.2d 367, 374 (C.A.3, 1962).

In *W. L. Gore & Associates, Inc., supra,* 424 F.Supp. at 704–05, Judge Wright held:

> If no fraud is involved, the key to ·the determination of bad faith is the reasonableness of the patentee's belief in the patent's validity:
>
> > [O]nly where the court is convinced that the patent in suit is so wholly devoid of substance that that plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable attorneys' fees pursuant to 35 U.S.C. § 285. *Indiana General Corp. v. Krystinel Corp.,* 297 F.Supp. 427, 449 (S.D.N.Y.1969).

Applying that standard to this case, the Court finds no basis for awarding the University attorney's fees for its defense of the patent infringement claim.[34] Accordingly, the University's motion for summary judgment on the attorney's fees issue will be denied.

An Order will be entered in accordance with this Opinion.

---

**34.** The equities in this case also weigh against awarding attorney's fees to the University. The plaintiff has asserted both patent and non-patent claims. The authority to award attorney's fees under § 285 is limited to the patent side of the case. *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., supra,* 407 F.2d at 297; *Time Mechanisms, Inc. v. Qonaar Corp.,* 422 F.Supp. 905, 916 (D.N.J. 1976). The facts the plaintiff relies upon to make out his claim for misappropriation of a trade secret are essentially the same as the facts cited by the University to establish its public use defense. Thus, most of the discovery completed to date is relevant to the nonpatent as well as the patent claims.